# Supreme Court of Louisiana

The Opinions handed down on the **31st day of October, 2014**, are as follows:

**BY VICTORY, J.**:

2014-C -0329
C/W
2014-C -0330

EDDY OLIVER, OSCARLENE NIXON, AND MILDRED GOODWIN v. ORLEANS PARISH SCHOOL BOARD (Parish of Orleans)

For the reasons stated herein, the judgments of the lower courts are reversed and this class action suit is dismissed.
REVERSED AND RENDERED.

JOHNSON, C.J., dissents and assigns reasons.
GUIDRY, J., additionally concurs and assigns reasons.
HUGHES, J., dissents.

## SUPREME COURT OF LOUISIANA

### NO. 2014-C-0329

### CONSOLIDATED WITH

### NO. 2014-C-0330

### *EDDIE OLIVER, OSCARLENE NIXON AND MILDRED GOODWIN*

### *VERSUS*

### *ORLEANS PARISH SCHOOL BOARD*

### ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FOURTH CIRCUIT, PARISH OF ORLEANS

**VICTORY, J.**

This class action arises out of the termination of approximately 7,600 former teachers and other permanent employees of the Orleans Parish School Board (the "OPSB") as a result of Hurricane Katrina and the State of Louisiana's subsequent takeover of Orleans Parish schools. Although the district court denied defendants' exceptions of *res judicata*, a five judge panel of the court of appeal unanimously found that *res judicata* ordinarily would apply to the facts of this case, but that exceptional circumstances barred its application. We granted two writ applications to determine whether the doctrine of *res judicata* bars plaintiffs' claims against the OPSB and/or the State defendants[1], and, if not, whether the OPSB and/or the State defendants violated the plaintiffs' due process rights in relation to the plaintiffs' terminations. For the reasons that follow, we agree with the court of appeal that *res judicata* applies but find no exceptional circumstances that would preclude its application. Further, we find that, even if *res judicata* did not apply to certain parties'

---

[1]The State defendants are the State of Louisiana, the Louisiana Department of Education, and the State Board of Elementary and Secondary Education.

1

claims, neither the OPSB nor the State defendants violated plaintiffs' due process rights.

## FACTS AND PROCEDURAL HISTORY

Because of severe financial problems within the OPSB, in 2004, the United States Department of Education (the "DOE") threatened to discontinue educational funding to the entire state. The DOE required that an external vendor be brought in to handle the OPSB's finances, and accordingly, in June 2005, the State and the OPSB entered into a Memorandum of Understanding ("MOU"), the purpose of which was to "provide an immediate and long term resolution of the OPSB's financial and operational challenges." Under the MOU, the OPSB would continue its operation and control over its school system and the State would monitor the progress of the OPSB and its superintendent in establishing and implementing appropriate accounting, human resources, and financial policies and procedures. As required by the MOU, the State selected Alvarez & Marsal ("A&M") as the external vendor through a competitive bid process, and the OPSB entered into a "Professional Services Contract" ("PSC") with A&M.

On August 29, 2005, Hurricane Katrina struck the Gulf Coast. At that time, the 2005-2006 school year had already begun and approximately 59,000 students were attending schools operated by the OPSB. The storm displaced hundreds of thousands of New Orleans residents and caused many of the schools across the region to close, including all of the OPSB schools. During its first post-Katrina board meeting on September 15, 2005, the OPSB approved "a resolution to place employees on disaster leave as a result of Hurricane Katrina given the emergency closure of all schools and the subsequent lack of revenues." The "disaster leave" was without pay, retroactive to August 29, 2005, and allowed the employees to collect unemployment

2

benefits while New Orleans and the OPSB tried to recover from the hurricane. A&M and the OPSB set up an employee hotline to communicate with displaced employees and to begin to determine which employees could return to work when the schools re-opened. The Call Center operated 24 hours a day and allowed non-active employees to inform the OPSB as to whether they intended to return to work. The Call Center was also used to determine which students might return to New Orleans.

In its First Extraordinary Session of 2005, the Louisiana Legislature passed Act 35, effective November 30, 2005, which resulted in the transfer of the vast majority of Orleans Parish public schools to the State's Recovery School District ("RSD"). The RSD was created in 2003 in conjunction with the adoption of an amendment to Article VIII, § 3(A) of the Louisiana Constitution authorizing the Louisiana State Board of Education ("BESE") to "supervise, manage, and operate . . . a public elementary or secondary school which has been determined to be failing." La. R.S. 17:10.5 was enacted and defined a "failed school" as one that is designated as "academically unacceptable under a uniform statewide program of school accountability established pursuant to rules adopted by [BESE]." In 2004, the Legislature enacted La. R.S. 17:10.6 to impose various restrictions on local school boards once they were determined to be "academically in crisis," which was defined as "any local system in which more than thirty schools are academically unacceptable or more than fifty percent of its students attend schools that are academically unacceptable."

Act 35 supplemented this existing constitutional and statutory framework by, among other things, creating La. R.S. 17:10.7, that added criteria by which a school could be designated as "failing" and immediately transferred to the RSD. La. R.S. 17:10.7(A)(1) provided that a school shall be designated as "failing" if it has a baseline school performance score below the state average, and is located in a district that both

3

has been declared to be "academically in crisis" and has at least one school eligible to be transferred to the RSD. This new provision resulted in 102 of the 126 public schools in Orleans Parish being taken over by the State after Hurricane Katrina. Of the 24 remaining, seven were closed as uninhabitable, twelve became charter schools, and five remained under the jurisdiction of the OPSB. This caused a severe loss of funding to the OPSB, including $17 million per month in Minimum Foundation Funds from the State, which funds follow the student and would now go to the RSD.[2] In addition, because the OPSB only retained five schools, it had a dramatically reduced need for employees. With regard to OPSB employees and the transfer of the schools to the RSD, La. R.S. 17:1990(D), which had been in effect since 2003, provided as follows:

> (1) The [RSD] may employ such staff members as it deems necessary. At the time of the transfer of a school to the school district, any certified teacher with regular and direct responsibility for providing classroom instruction to students who is employed in the transferred school by the prior system shall be given priority consideration for employment in the same or a comparable position by the school district.

> (2) Any person employed by the prior system in a transferred school may choose to remain in the employ of the prior system and, in that case, the prior system shall retain and reassign such person consistent with its contractual obligations or policies regarding the retention and reassignment of employees. (Emphasis added).

At this time, the OPSB had in force Personnel Policy 4118.4, which applied to all employees, and which provided:

> The Orleans Parish School Board seeks to attract, retain and promote the highest caliber employee. It believes that job security should be primarily a function of quality performance by each and every employee. Such factors as enrollment decline, budget shortfalls, district reorganization and program changes, however, may require a Reduction In Force (RIF), thereby causing personnel to be separated from service even though job performance has been satisfactory. It is the intent of the Orleans Parish School Board to implement a Reduction In Force, when necessary, in a manner which is reasonable, fair, practical and consistent with established

---

[2]*See* La. R.S. 17:1990.

policy, procedures, regulations and applicable law.

All affected employees shall be given the opportunity, either directly or through their appropriate representatives, to voice their concerns to the administration about any proposed revision of such established procedures or regulations.

The OPSB also had in force Personnel Regulation 4118.4-R, which governed the implementation of a Reduction in Force ("RIF"), including notice procedures to employees, procedures for developing a Recall List, procedures for reducing, retaining, reclassifying, and transferring employees based upon seniority. Section D of Policy 4118.4, entitled "Recall," provided as follows:

Administrators[3] who have been reclassified, reduced in position, or laid off, because of a RIF shall be placed on a Recall List by job category. Seniority earned as of that time shall be maintained while affected by the RIF for two (2) calendar years. As vacancies occur, administrators shall be recalled in order of seniority.

While La. R.S. 17:81.4 required the OPSB to have a RIF policy, it did not have one at this point.

This action was filed on October 28, 2005 and sought a temporary restraining order and preliminary and permanent injunctive relief to prevent the OPSB from violating the teachers' legal rights to employment. Plaintiffs' stated in the petition:

Plaintiffs have a property interest at stake, hence 'due process' rights. Each has either a written or implied employment contract with the [OPSB] and are protected by a "Reduction in Force" policy under state law. *La. R.S. 17:81.4 (Reduction in Force; dismissal of teachers and other school employees);* [OPSB]'s Reduction in Force Policy 4118.4 and related Regulation 4118.4. This state law is being intentionally circumvented by [OPSB] action to create charter schools thereby constructively terminating the employment of these . . . employees.

A First Amending and Supplemental petition filed on November 3, 2005 specified the relief sought, which was to enjoin the OPSB from establishing new charter schools without affording plaintiffs various due process protections allegedly conferred by La.

---

[3]While the specific language of this policy applied only to Administrators and Certificated Administrators, all parties represent that, in practice, it applied to all OPSB employees.

R.S. 17:81.4 and OPSB Policy 4118.4. The district court denied the TRO. On November 30, 2005, the acting Superintendent of the OPSB issued a press release entitled "Notification From Orleans Parish School Board," which advised all employees that they were terminated:

> [P]otentially 7,500 employees who were currently on disaster leave would be affected. The categories of employees who will be affected are: central office clerical, school site clerical, central office administrators, school site administrators, teachers, social workers, nurses, counselors, librarians, coaches, support and appraisal services, para educators/interpreters, custodians, transportation workers, maintenance, food services and security. These employees have been on unpaid leave and have not been receiving salary since Hurricane Katrina.

The letter further stated that OPSB's "actions became necessary, first by the Katrina disaster, and then by the State having recently created a recovery district with responsibility for most of the schools that had been under [OPSB] control."

On December 9, 2005, the OPSB passed Resolution No. 59-05 (later renumbered 70-05), authorizing A&M to implement a RIF terminating those employees who had formerly been placed on disaster leave. On January 31, 2006, plaintiffs filed a Second Amending and Supplemental Petition naming the State as a defendant for purposes of challenging the constitutionality of Act 35 and seeking a declaratory judgment that Act 35 is unconstitutional and that the RSD give priority consideration to the OPSB employees, and a TRO be issued enjoining the OPSB from terminating the employees as of January 31, 2006. The district court issued the TRO that same day, prohibiting the OPSB from terminating all employees on that day because an OPSB resolution required a sixty day notice. The State was later dismissed on March 24, 2006. On February 13, 2006, the district court converted the TRO into a preliminary injunction to ensure that certain procedural safeguards were provided to plaintiffs pursuant to Policy 4118.4 prior to the RIF taking effect.

6

The OPSB adopted Resolution 08-06 on February 15, 2006, which directed its acting superintendent to send written notice to all OPSB employees that had been placed on disaster leaving advising that, as a result of Hurricane Katrina, Hurricane Rita, and the passage of Act 35, a RIF was being instituted and they would be terminated effective thirty days from the issuance of the written notice. On February 22, 2006, the OPSB notified all OPSB employees in a letter that a RIF was being instituted and that termination would be effective March 24, 2006, and which further provided:

> At its February 15, 2006 meeting the Orleans Parish School Board passed a resolution to implement a Reduction -In-Force to terminate all non-active employees (i.e. employees on disaster leave) upon 30 days' written notice. The letter served as your official notice of termination as a non-active employee and was forwarded to each employee's last known address that the OPSB had on file.
>
> . . .
>
> Regardless of the title of the position you held, you will be terminated on March 24, 2006 [and that the OPSB did not] anticipate calling employees back to work and will not prepare a recall list.
>
> . . .
>
> As employment positions become available, affected employees will be recalled as appropriate, and in accordance with the policy of the OPSB.
>
> . . .
>
> The fortuitous events of Hurricane Katrina and the passage of Act 35 placing approximately 102 New Orleans Schools under the control of the State of Louisiana through the Recovery School District drastically impacted the infrastructure and financial standing of the district.

In addition to this lawsuit, three other lawsuits were filed complaining of the OPSB employees' terminations. On February 17, 2006, the United Teachers of New Orleans ("UTNO"), which is the exclusive bargaining representative for all Orleans Parish teachers, etc., and three individuals who are also class members in this case, Germaine Arthur (a tenured teacher), Kym Celestine (a non-tenured teacher), and

7

Wanda Gaudet (a tenured clerical employee), filed a petition for declaratory judgment in Orleans Parish Civil District Court [*UTNO/Arthur*]. The petition sought a judgment declaring the OPSB violated Louisiana law, specifically La. R.S. 17:461,[4] 17:462,[5] 17:522,[6] and 17:523[7] of the Teacher Tenure Laws, by placing in excess of 7,000 employees on an unauthorized, unrecognized, and unpaid "disaster leave," by terminating employees on January 31, 2006, by failing to pay full salary to non-tenured teachers and other employees from August 29, 2005 through January 31, 2006, and by failing to pay full salary to tenured teachers and other employees from August 29, 2005 through the present date and continuing. The plaintiffs further asserted that those actions violated petitioners' statutory and procedural and substantive due process rights as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution and Art, I, Sec. 2 of the La. Constitution.

On March 27, 2006, UTNO and three individual plaintiffs, Tammy Davis, Wanda Gaudet, and Valerie Prier, filed a Petition for Declaratory Judgment in the 19th Judicial District Court (Declaring as Unconstitutional Certain State Statutes Relating to Takeover of Public Schools by Recovery School District) against BESE, the LDOE, the RSD, and the OPSB [*UTNO/Davis*]. The suit challenged the constitutionally of various provisions of Act 35. First, the petition alleged that La. R.S. 17:1990 (enacted through Act 35) impaired the obligations of UTNO and OPSB to each other as set forth in three Collective Bargaining Agreements ("CBAs"). Specifically, the CBAs were the product of arms-length negotiations between UTNO

---

[4]Relating to probation and tenure of teachers and repealed by Acts 2012, No. 1, § 4, eff. July 1, 2012.

[5]Relating to permanent teachers, causes for removal, and procedure and repealed by Acts 2012, No. 1, § 4, eff. July 1, 2012..

[6]Relating to probationary term and tenure.

[7]Relating to permanent employees, causes for removal and procedure.

and the OPSB over wages, hours and working conditions, La. R.S. 17:1990 gave the RSD broad sweeping power to operate the OPSB schools "with all the same power and authority as the prior system from which [they] were transferred," and the RSD "has no plans to apply the CBAs to the schools in Orleans Parish that it will operate." The suit also challenged La. R.S. 17:10.7(A)(1), which authorized the transfer of a school system "academically in crisis" to the RSD, because the transfer solely of OPSB schools was arbitrary, and because the statute violates the concept of local control of school systems as envisioned by Art. 8, Sec. 3 of the Louisiana Constitution. The petition sought the following in their judgment:

A.) Declaring certain provisions contained in Act 35 of the First Extraordinary Session of the 2005 Louisiana legislature as unconstitutional for reasons as described above;

B.) Declaring that the constitutional principle of local control of school boards should be upheld, and that the management, operation and control of schools located in Orleans Parish schools should be returned to the body elected by the citizens of Orleans Parish;

C.) Declaring that as a remedy for violating Article I, Section 10 of the Louisiana Constitution of 1974, (impairment of the Collective Bargaining Agreements) the Collective Bargaining Agreements remain in effect, and defendant Orleans Parish School Board is obligated to abide by their terms and provisions;

D.) Declaring that petitioner United Teachers of New Orleans is entitled to damages occasioned by the enactment of Act 35 causing the impairment of the contracts between the Orleans Parish School Board and the United Teachers of New Orleans;

E.) Ordering reimbursement of court costs and payment of petitioners' attorney fees;

F.) And for all other general and equitable relief.

The OPSB and State defendants filed exceptions of no right of action as to the individual plaintiffs and no cause of action. The trial court granted these exceptions

9

on September 27, 2006.[8]  On appeal, the plaintiffs only challenged the granting of the

exception of no cause of action.  In describing the suit, the court of appeal explained

that the plaintiffs were alleging they were aggrieved because "the RSD failed to apply

the CBAs that had been negotiated between UTNO and OPSB to the schools under

its authority and [therefore] the CBAs were abrogated in violation of the contract

clauses of the state and federal constitutions."[9]

The court of appeal affirmed the trial court's grant of the exception of no cause

of action with several key findings.  First, the court of appeal found that the

implementation of Act 35 did not impair the contractual obligation between UTNO and

the OPSB:

> The RSD and OPSB are separate and distinct entities.  It is true that the
> law in effect prior to Act 35 vested the RSD with the same power and
> authority previously vested in OPSB with regard to the schools
> transferred to its jurisdiction. LSA-R.S. 17:1990(B)(2)(a).  However, this
> statute did not require the RSD to assume all of the employment-related
> obligations previously owed by OPSB, as the RSD was specifically given
> the authority to hire such staff as it deemed necessary, with the restriction
> that the RSD was to give priority consideration to certain teacher
> employees who were employed in the transferred school by the prior
> system. LSA-R.S. 17:1990(D)(1).[10]

The court of appeal found that the enactment of Act 35 was justified by a significant

and legitimate public purpose, i.e., to regulate and improve the education provided to

---

[8]With regard to the OPSB, the court of appeal noted:

> Although the trial court had explicitly sustained OPSB's peremptory exception
> raising the objection of no cause of action at the hearing, and the minute entry of the
> hearing also noted the exception as being sustained, that exception was not mentioned
> in the judgment signed by the trial court.  Plaintiffs appealed the trial court's oral ruling
> that sustained OPSB's exception; however, this issue is now moot, as plaintiffs filed a
> motion to dismiss OPSB from the appeal, with prejudice, prior to oral argument before
> this court.  That motion was subsequently granted by this court.

*United Teachers of America v. State Bd. of Elementary and Secondary Educ.*, 07-0031 (La.
App. 1 Cir. 3/26/08), 985 So.2d 184, 190, n. 7.

[9]*Id.* at 192.

[10]*Id*. at 194.

10

Louisiana throughout the state's public schools, and was reasonable and appropriate under the circumstances.[11] The court of appeal further found that any impairment that may have occurred was minimal, as the suit was not filed until March 2006 and the CBAs were scheduled to expire on June 30, 2006.[12]

In addition, on January 27, 2006, UTNO filed various grievances on behalf of "affected teachers,""affected para educators," and "affected clerical employees," basically complaining of the OPSB's failure to give the employees written notice of the layoffs, failure to pay the employees during the closure of the schools, and failure to timely reopen the schools, all resulting in loss of pay. These grievances were filed under the grievance procedure of the CBAs. The remedies sought by these grievances included written notice of lay-off, acknowledgment that the CBAs had been violated and monetary damages so that "[e]mployees receive the pay that they are entitled to . . ." Other grievances alleged the OPSB violated specific provisions in the CBAs dealing with the "Health and Welfare Fund," medical insurance, and employed non-union members at the Charter Schools.

A Third Amending and Supplemental Petition was filed in the present case on July 26, 2006, naming the State, BESE, the DOE, and the RSD as defendants and seeking to enjoin the State from acting pursuant to Act 35 and challenging La. R.S. 17:1990(D)(1). This petition also alleged that Act 35 was unconstitutional, but that claim was severed and has never been decided. Subsequently, the OPSB and the State defendants filed peremptory exceptions of *res judicata*, claiming that plaintiffs' claims were settled in the UTNO's lawsuits against the OPSB. The district court denied the exceptions of *res judicata* without reasons.

---

[11]*Id.* at 196, 197.

[12]*Id.* at 198.

On August 10, 2006, certain of the grievances filed by UTNO on behalf of its members went to arbitration – AAA Case No. 69 390 L 02011 06, AAA Case No. 69 390 L 02022 06, and AAA Case No. 69 390 L 02017 06. On October 13, 2006, the arbitrator issued an award in those three arbitrations. The arbitrator found that the OPSB "did, in fact, violate Art. I when it allowed [the Algiers Charter School Association] to staff certain charter schools outside the bargaining unit and/or when it prevented members of the bargaining unit to be named employees of the prospective charter schools." However, the arbitrator found that the award would "have no adverse effect on members of the bargaining unit who were given work opportunities at the schools reopened prior to the expiration of the school year." In addition, the arbitrator ordered the OPSB to make payments to the Health & Welfare Fund for the period between July 2005 and March 24, 2006, and that these payments would serve as a credit against the set liability for that period. On January 10, 2007, UTNO filed suit against the OPSB seeking to modify or vacate this Arbitration Award (***UTNO v. OPSB***).

On September 18, 2007, a global settlement was reached in all these matters between UTNO and the OPSB (the "Global Settlement.") Specifically, the Global Settlement stated:

**I. Statement of Purpose; Matters settled:**

This Agreement is entered into on the date(s) shown below in order to bring to conclusion the following litigation, grievances, and arbitrations pending between the United Teachers of New Orleans (hereinafter sometimes referred to as UTNO) and the Orleans Parish School Board (hereinafter sometimes referred to as OPSB or School Board):

A.    Litigation: *United Teachers of New Orleans et al v Orleans Parish School Board*, Civil District Court for the Parish of Orleans, No. 2007-229, Division "I." This Litigation consists of UTNO's Petition/Motion to Vacate Arbitrator's Award in nine separate arbitrations [***UTNO v. OPSB***].

B.  Litigation: *United Teachers of New Orleans, Germaine Arthur, Kym Celestine and Wanda Gaudet v. Orleans Parish School Board*, Civil District Court for the Parish of Orleans, No. 2006-906, Division D [***UTNO/Arthur***].

C.  Litigation: *United Teachers et al v. Orleans Parish School Board, State Board of Elementary Education, OPSB, et al* No. First Circuit Court of Appeal No. 2007-CA-0031 [***UTNO/Davis***].

D.  AAA Arbitration No. 69 300 12523 (consisting of three consolidated "Emergency Leave" arbitrations);

E.  AAA Arbitration No. 69 300 12541 (consisting of three consolidated "Layoff" arbitrations);

F.  AAA Arbitration No. 69 300 12541 (consisting of three consolidated "Natural Disaster" arbitrations).

## II.  ORLEANS PARISH SCHOOL BOARD AGREEMENTS

**Contingent upon approval of the Orleans Parish School Board at its Regular Business Meeting on September 25, 2007:**

A.  OPSB shall pay to UTNO the total amount of $7,000,000.00 in two equal annual installments of $3,500,000.00 on October 31, 2007 and October 31, 2008.  This payment represents settlement of the arbitrations listed in I-D, E, F, described above.

B.  $200,000 of the total settlement amount represents OPSB's contribution to the cost of administering settlement disbursements to the members of the UTNO bargaining unit.

C.  The Orleans Parish School Board shall direct the Superintendent of Schools to appoint a bargaining team which shall enter into good faith negotiations with UTNO towards the goal of entering into Collective Bargaining Agreement(s) providing for wages, hours and working conditions for members of the bargaining unit(s) as agreed upon.

D.  OPSB shall pay the cancellation costs and fees of the arbitrators in the arbitrations identified in I-D, E,F above.

## IV.  UNITED TEACHERS OF NEW ORLEANS AGREEMENTS

Upon approval of the settlement by the Orleans Parish School Board, UTNO agrees:

13

A.     To file pleadings in the Civil District Court for the Parish of Orleans, withdrawing and dismissing, with prejudice, the litigation entitled "*United Teachers of New Orleans et al v. Orleans Parish School Board,*" Civil District Court for the Parish of Orleans, No. 2007-229, Division "I."

B.     To file pleadings in the Civil District Court for the Parish of Orleans, withdrawing and dismissing, with prejudice, the litigation entitled "*United Teachers of New Orleans, Germaine Arthur, Kym Celestine and Wanda Gaudet v. Orleans Parish School Board,*" Civil District Court for the Parish of Orleans, No. 2006-906, Division D, consisting of a petition challenging the termination of certain Board employees, which was filed by the Union.

C.     To file pleadings in litigation entitled "*United Teachers et al v. Orleans Parish School Board, State Board of Elementary Education et al*" No. 2007-CA-0031, pending in the First Circuit Court of Appeal dismissing the OPSB as a named defendant.

D.     To inform the three arbitrators in AAA Arbitration No. 69 300 12523 (Emergency Leave consolidated arbitrations); AAA Arbitration No. 69 300 12541 (Layoff consolidated arbitrations), and AAA Arbitration No. 69 300 12514 (Natural Disaster consolidated arbitrations), that the arbitrations have been settled, and provide the arbitrators with the necessary information so that the terms and conditions of the settlement may be reduced to an Award.

## III.  MUTUAL AGREEMENTS

A.     UTNO and OPSB understand, acknowledge and agree that they each are entering into this Agreement in order to fully, completely and finally resolve the underlying disputes and bring the matters stated herein to conclusion.

B.     UTNO and OPSB agree that the terms and conditions stated in this settlement agreement are fair and just.

A Fourth Amending and Supplemental Petition was filed in the present case on March 23, 2007, seeking class certification and for the first time seeking damages from the OPSB and State defendant's "wrongful conduct."  Paragraph 72 of this petition claimed that the plaintiffs' damages included:

14

(A) Constitutional violations (due process and property rights);

(B) Violation of plaintiffs' employment rights under *La. R.S. 17:461, 17:462, and 17:522*, including but not limited to lost wages/salary, lost income, benefits and emoluments;

(C) Contractual rights under Louisiana law;

(D) *La. Civil Code 2315* damages (tortious interference);

(E) Other statutory and/or jurisprudential rights for public school employees;

(F) General damages;

(G) Equitable relief; and

(H) Plaintiffs reserve the right to request a declaratory judgment hearing on their previously severed claim that La. R.S. 1990 as amended by Act 35 (the post-Katrina public school takeover law) is unconstitutional as implemented.

The plaintiffs sought monetary damages, including lost wages/salary, lost income, benefits, and emoluments, and general damages, plus attorney fees and legal interest.

The class was certified on December 10, 2008, affirmed by the court of appeal,[13] and this Court denied writs on March 5, 2010.[14] The class was defined as follows:

All current or former employees of the Orleans Parish School Board prior to Hurricane Katrina [August 29, 2005], who were terminated and/or forced to retire under the threat of termination from employment by the Orleans Parish School Board, and claim to have sustained economic injury and/or mental anguish and emotional distress as a result of termination and/or being forced to retire under the threat of termination from employment.[15]

---

[13]*Oliver v. Orleans Parish School Board*, 09-0489 (La. App. 4 Cir. 11/12/09), 25 So. 3d 189.

[14]*Oliver v. Orleans Parish School Board*, 09-2708 (La. 3/5/10), 28 So. 3d 1012 (Victory, J. and Guidry, J., would grant).

[15]The classes were divided into subclasses composed of "Tenured, Certified Teachers," "Tenured, Certified Teacher Promoted to Positions of Higher Salary," "Employees with 'permanent status' other than classroom teachers," and "Employees forced to retire under duress."

On April 16, 2010, the class representatives filed a Fifth Amending and Supplemental Petition, alleging for the first time that the OPSB and State defendants "conspired to and, in fact, committed wrongful conduct which included, but was not limited to, the following: a) wrongful termination of plaintiffs and class members; and/or b) intentional interference with the plaintiffs' and class members' employment contracts and/or property rights." The petition specifically alleged:

> At all times relevant herein: a) the plaintiffs and the class members all had employments contracts and/or legally protected employment interests between them and the defendants; b) the defendants were fully aware of these employment contracts and/or state-mandated due process and property as identified in Paragraph 72 of Plaintiffs' Fourth Amending and Supplemental Petition; c) the defendants conspired and/or acted jointly to intentionally induce and/or cause the breaching of these employment contracts and/or legally protected employment interests, and/or intentionally rendered the performance of the employment contracts and/or legally protected employment interests impossible or more burdensome; d) the defendants did not have reasonable justification for their actions; and e) the defendants conspiring and/or joint actions resulted in the breach of the employment contracts and/or legally protected employment interest at issue herein, thereby causing damages to plaintiffs as identified in Paragraph 72 of Plaintiffs' Fourth Amending and Supplemental Petition.

After a 15-day bench trial in May and June, 2011, the district court issued a "Judgment and Reasons for Judgment." The district court found that the OPSB had violated the plaintiffs' due process rights by failing to provide them with a meaningful appeal as required by La. R.S. 17:81.4 and Personnel Policy 4118.4-R because no member of the class received a grievance hearing subsequent to the RIF. In addition, the district court found the OPSB violated the class members' due process rights by failing to create a recall list prior to the mass termination as required by La. R.S. 17:81.4 and Personnel Policy 4118.4-R. While the district court found that the State's actions were authorized by Act 35, it found the State was solidarily liable for the wrongful termination of the class members because it was in partnership with the OPSB by virtue of the MOU, and the State and the OPSB were mandates of A&M

16

(which it found wrongfully terminated the entire OPSB workforce). Lastly, the district court found the State liable for intentional interference with the employment contracts between the class members and the OPSB. Thus, the district court concluded that the OPSB and the State were "jointly and solidarily" liable "for all compensatory damages hereafter judicially determined to have been sustained by each member of [the class]." The district court then awarded five-years worth of "loss of income" damages to each class representative as follows:

| | |
|---|---|
| Antoinette Aubry-Guillory | $330,815.00 |
| Karen Marks | $48,101.00 |
| Gwendolyn Ridgely | $480,616.00 |
| Lois Lockhart | $220,089.00 |
| Linda Pichon | $120,462.00 |
| Barbara Moore | $68,431.00 |
| Cynthia Jordan | $94,118.00 |

The Fourth Circuit Court of Appeal affirmed the judgment in part, reversed in part, and remanded the case for further proceedings.[16] The court of appeal ruled that the trial court did not err in denying the defendants' exceptions of *res judicata*, but on different grounds.[17] The court noted that two of the previously filed lawsuits involved the same specific claims as this lawsuit–***UTNO/Davis*** challenged the constitutionality of Act 35 and ***UTNO/Arthur*** asserted claims that plaintiffs' employment rights pursuant to La. R.S. 17-461-62 and 17:522 had been violated–and that the defined class in this case includes employees who were part of the UTNO settlement.[18] However, the court found that "even though the Union settlement may support preclusion under normal circumstances, the matter *sub judice* represents a truly exceptional situation as to warrant this Court's discretion in barring the application of

---

[16]***Oliver v. Orleans Parish School Board***, 12-1520 (La. App. 4 Cir. 1/15/14), 133 So. 3d 38.

[17]***Id.*** 133 So. 3d at 50-56.

[18]***Id.*** at 50, n. 30.

res judicata pursuant to La. R.S. 13:4232."[19]  The reasons the court of appeal found for applying the "exceptional circumstances" exception to *res judicata* included: (1) plaintiffs were asserting claims that had not previously been actually litigated or adjudicated; (2) the plaintiffs only received "minimal consideration" through the UTNO settlement; and (3) the OPSB did not seek dismissal of this case through the UTNO settlement.[20]

Regarding liability, while the court of appeal found that the OPSB's RIF was lawful, it found class members had a "substantive right to be recalled," which the OPSB violated by failing to create a recall list as required by Personnel Policy 4118.4(D).[21]  Specifically, the court of appeal found:

> In the instant case, the Appellees were entitled to, but not granted, the procedural protections of the [OPSB's] Policy.  A Requirement of the [OPSB's] Policy was that employees affected by an [sic] RIF had recall rights for two years.  In failing to create the Recall List, the Appellees lost the opportunity for employment for a minimum of two years.  For these reasons we affirm the trial court's finding of liability against the [OPSB] for violating the Appellees' due process rights.[22]

The court of appeal reversed the district court's ruling that the State was solidarily liable with the OPSB, finding that the MOU did not create a partnership between the two.[23]  Further, the court of appeal reversed the district court's ruling that the State was independently liable for tortious interference with contract, finding that "Act 35, La. R.S. 17:10.5 *et seq.* and La. R.S. 17:1990 provided the State with the power and authority to transfer funding and facilities to the RSD."[24]  However, the court found

---

[19]*Id.* at 55.

[20]*Id.* at 55, 56.

[21]*Id.* at 46.

[22]*Id.*

[23]*Id.* at 49.

[24]*Id.* at 47.

the State liable for violating the class members' due process rights by failing to give them "priority consideration" in hiring for the RSD schools which they were statutorily mandated to do by virtue of La. R.S. 17:1990(D)(1).[25] La. R.S. 17:1990(D)(1) provides:

> At the time of the transfer of a school to the school district [RSD], any certified teacher with regular and direct responsibility for providing classroom instruction to students who is employed in the transferred school by the prior system shall be given priority consideration for employment in the same or comparable position by the school district.

The court of appeal found there was "absolutely no evidence that qualified Appellees were provided the consideration mandated by the statute," and that instead, the State advertised for the positions nationally and "contracted with Teach for America to hire inexperienced college graduates that did not have teacher certification."[26] The court of appeal held that "[b]y not following that mandate, the State, through the RSD, violated the constitutional due process rights of those teachers, resulting in their loss of opportunity for continued employment."[27]

Regarding damages, the court of appeal amended the district court's award of damage, and found the OPSB liable for two years of back pay and fringe benefits, and that the State was liable only to teachers meeting the criteria of of La. R.S. 17:1990(D)(1) for an additional one year of year of back pay and fringe benefits.[28]

We granted the OPSB's and the State's writ applications to determine if the doctrine of *res judicata* applies to preclude plaintiffs' claims, and if not, whether the OPSB and/or the State is liable for violating plaintiffs' due process rights.[29]

[25]*Id.* at 48.

[26]*Id.*

[27]*Id.*

[28]*Id.* at 50.

[29]*Oliver v. Orleans Parish School Board*, 14-0329 and 14-0330 (La. 6/20/14), 141 So. 3d 274.

# DISCUSSION

## *Res Judicata*

The doctrine of *res judicata* precludes the re-litigation of all causes of action arising out of the same transaction and occurrence that were the subject matter of a prior litigation between the same parties. Specifically, Louisiana's *res judicata* statute provides:

> Except as otherwise provided by law, a valid and final judgment is conclusive between the same parties, except on appeal or other direct review, to the following extent:
>
> (1) If the judgment is in favor of the plaintiff, all causes of action existing at the time of final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and merged in the judgment.
>
> (2) If the judgment is in favor of the defendant, all causes of action existing at the time of the final judgment arising out of the transaction or occurrence that is the subject matter of the litigation are extinguished and the judgment bars a subsequent action on those causes of action.
>
> (3) A judgment in favor of either the plaintiff or the defendant is conclusive, in any subsequent action between them, with respect to any issue actually litigated and determined if its determination was essential to that judgment.[30]

As the Official Comments note, the 1990 amendment to La. R.S. 13:4231 "makes a substantial change in the law," as under the prior statute, "a second cause of action would be barred by the defense of res judicata only when the plaintiff seeks the same relief based on the same cause of action or grounds." [31] Under the revised statute, "[t]he central inquiry is . . . whether the second action asserts a cause of action which arises out of the transaction or occurrence which was the subject matter of the first action."[32] "This serves the purpose of judicial economy and fairness by requiring the

---

[30]La. R.S. 13:4231 (as amended by Acts 1990, No. 521, § 521, eff. Jan. 1, 1991).

[31]*Id.*

[32]*Id.*

20

plaintiff to seek all relief and to assert all rights which arise out of the same transaction or occurrence."[33] This is in line with La. C.C.P. art. 425, which also now requires that a party "shall assert all causes of action arising out of the transaction or occurrence that is the subject matter of the litigation." The Comments to Article 425 explain that Article 425 was amended at the same time as the *res judicata* statute and "expands the scope" of the Article to reflect those changes made to the *res judicata* statute and to put "the parties on notice that all causes of action arising out of the transaction or occurrence that is the subject matter of the litigation must be raised."[34] Similarly, La. C.C.P. art. 891 was also amended to include the same "transaction or occurrence" language, requiring that a petition "shall contain a short, clear, and concise statement of all causes of action arising out of, and of the same material facts of, the transaction or occurrence that is the subject matter of the litigation."

In *Burguieres v. Pollingue*,[35] this Court set out the five prerequisites for a finding of *res judicata* under the revised statute: (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of the final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out of the transaction or occurrence that was the subject matter of the first litigation.

Regarding the first two factors, we have no trouble finding that the judgment upon which the defendants' *res judicata* claim is based, i.e., the Global Settlement dismissing with prejudice two of the three concurrent lawsuits, *UTNO v. OPSB,* and *UTNO/Arthur* was a valid, final judgment. Further, the OPSB was dismissed with

---

[33]*Id.*

[34]La. C.C.P. art. 425, Official Revision Comments (1990).

[35]02-1385 (La. 2/25/03), 843 So. 2d 1049, 1052, 1053.

prejudice from the ***UTNO/Davis*** suit by virtue of the settlement, and the claims against State defendants were dismissed with prejudice when the trial court granted their exception of no cause of action and the court of appeal affirmed. For purposes of *res judicata*, a valid judgment is one rendered by a court with jurisdiction over both the subject matter and the parties after proper notice was given and a final judgment is one that disposes of the merits in whole or in part.[36] The ***UTNO*** dismissals with prejudice were all rendered by courts of proper jurisdiction, after proper notice, and disposed of the merits in whole or in part. Both a dismissal with prejudice and a settlement are "final" adjudications for the purposes of *res judicata*.[37] The three prior litigations were all dismissed as part of the global settlement *with* prejudice and *without* any reservation of rights. The class members argue that because the Global Settlement did not dismiss with prejudice the instant suit, that *res judicata* does not apply. La. R.S. 13:4232(A)(3) provides an exception from the application of *res judicata* where the judgment "reserved the right of the plaintiff to bring another action." It is the plaintiff's burden to specifically reserve his rights to maintain or bring another suit; the lack of any mention of the present suit in the Global Settlement is not a "reservation of rights." Further, another determinative factor is the preclusive effect that the suits that were dismissed with prejudice have on the instant suit and that is explained below. While "a party claiming *res judicata* based on a compromise must have been a party to the compromise, and the authority of the thing adjudged extends only to the matters those parties intended to settle,"[38] where a compromise dismisses with prejudice other lawsuits, the preclusive effect of the dismissals of those lawsuits

---

[36]***Burguieres***, 843 So. 2d at 1053.

[37]***Ortega v. State, Dept. of Transp. and Development***, 96-1322 (La. 2/25/97), 689 So. 2d 1358, 1363.

[38]***Id.*** at 1363.

must also be considered. Thus, even if UTNO did not intend to settle this suit, the dismissal of the other named lawsuits with prejudice provides a basis for *res judicata*.

The fifth requirement is that the cause or causes of action asserted in the second action arose out of the transaction or occurrence that was the subject matter of the first litigation. The "first litigation" in this instance is all, or any of, the suits and arbitrations that were dismissed with prejudice or settled in the Global Settlement, and the dismissal of the State from the ***UTNO/Davis*** suit on an exception of no cause of action. After reviewing the extensive record, we find that not only do the causes of action in the second action arise out of the same transaction and occurrence that was the subject matter of the prior lawsuits, some of the causes of action asserted are exactly the same. The causes of action in the Original through Fifth Amending and Supplemental Petition filed in the pending suit arise out of the OPSB and the State defendants' actions in placing the plaintiffs on disaster leave, terminating them in violation of their contracts with the OPSB and in violation of OPSB policy, placing the schools in the hands of the RSD, and failing to abide by certain statutes in staffing the RSD schools, all as a result of Hurricane Katrina, the RIF, and the implementation of Act 35.

In ***UTNO/Arthur***, the Union and various employees of the OPSB alleged that the OPSB violated La. R.S. 17:461, 17:462, 17:522, and 17:523 of the Teacher Tenure Laws and the employees' procedural and substantive due process rights by placing the employees on "disaster leave," by terminating the employees on January 31, 2006, by failing to pay full salary to non-tenured teachers and other employees from August 29, 2005 through January 31, 2006, and by failing to pay full salary to tenured employees from August 29, 2005 through the date of the suit and continuing.

Likewise, the plaintiffs' original Petition in the present suit alleged the plaintiffs had a "property interest at stake, hence 'due process' rights" that was violated by the implementation of the RIF. And, the Fourth Amended and Supplemental Petition alleged that the OPSB and the State defendant's "wrongful conduct" constituted "Constitutional violations (due process and property rights)" and violated "plaintiffs' employment rights under *La. R.S. 17:461, 17:462, and 17:522*, including but not limited to lost wages/salary, lost income, benefits and emoluments." (Emphasis in original). Thus, the alleged due process and statutory violations were the exactly the same in *UTNO/Arthur* and the present suit.

The *UTNO/Davis* suit alleged that La. R.S. 17:1990 (enacted through Act 35) was unconstitutional and it impaired the obligations of UTNO and OPSB to each other as set forth in three CBAs (which set forth wages, hours and working conditions) because it gave the RSD broad powers to operate the OPSB schools and the RSD was not going to apply the CBAs to the OPSB schools that it was taking over. The plaintiffs sought a declaratory judgment that the CBAs remain in effect and that the OPSB was obligated to abide by its terms and conditions. Further, the plaintiffs sought damages "occasioned by the enactment of Act 35 causing the impairment of the contracts between the [OPSB] and [UTNO]." Likewise, the Fifth Amending and Supplemental Petition in this case alleged the plaintiffs' had employment contracts and/or legally protected employment interest and that OPSB and the State defendants "conspired and/or acted jointly to intentionally induce and/or cause the breaching of these employment contracts and/or legally protected employment interests, and/or intentionally rendered the performance of the employment contracts and/or legally protected employment interests impossible." In other words, the plaintiffs asserted that their employment contracts with the OPSB were not being honored, that the RSD

24

was not going to honor them after it took over the schools and that these actions impaired their employment contracts with the OPSB, the exact claim made in the *UTNO/Davis*. In addition, in affirming the trial court's grant of the exception of no cause of action in favor of the State, the court of appeal in *UTNO/Davis* found that La. R.S. 17:1990 "did not require the RSD to assume all of the employment-related obligations previously owed by OPSB," as it could have such staff as it deemed necessary. The hiring obligations of the RSD under La. R.S. 17:1990 are at the center of the present suit as well.

Further, numerous grievances that were filed according to the CBAs and were sent to arbitration complained of the OPSB's failure to pay the employees during the closure of the schools and failure to reopen the schools, all of which caused them loss of pay. That is essentially the claim made against the OPSB in this case. These arbitrations were settled pursuant to the Global Settlement.

The class members argue that the Global Settlement "did not involve or in any way pertain to the instant *Oliver* litigation" and "involved entirely different claims from those involved in *Oliver*." The class members claim that the Global Settlement is the result of disputes following the OPSB's violation of specific clauses in the CBAs between the OPSB and unionized teachers which existed at the time of Katrina. Conversely, they argue, the instant case arose out of the wrongful termination of tenured and permanent staff and teachers, which they claim is an issue separate and apart from the CBAs. We disagree. As stated above, some of the claims in these *UTNO* suits are *exactly the same* as in the instant case, but even accepting the class members' assertions, what they fail to recognize is that the violation of the CBAs and the violation of the employment contracts all arose out of the same transaction and occurrence, i.e., their loss of employment due to the closure of the OPSB schools

25

following Hurricane Katrina and their transfer to the RSD by virtue of Act 35.

The fourth requirement, that the causes of action asserted in this case existed at the time of final judgment in the **UTNO** case, is also met. The Global Settlement was signed on September 18, 2007 to settle and dismiss with prejudice the **UTNO v. OPSB** and **UTNO/Arthur** suits, and to dismiss OPSB with prejudice from the **UTNO/Davis** lawsuit, along with three separate litigations. Further, the trial court in **UTNO/Davis** had dismissed all claims against the State defendants on an exception of no cause of action (which was later affirmed on appeal). At this time, all employees of the OPSB had been terminated, the Orleans Parish public schools had been transferred to the RSD, and the plaintiffs in this matter had already filed their Fourth Amending and Supplemental Petition seeking damages and class certification. It is therefore clear that any causes of action arising out of the placement of employees on disaster leave on September 15, 2005, terminating the employees by virtue of the February 22, 2006 RIF notice, or the State defendants' actions in hiring employees when the schools were transferred to them according to Act 35 existed by the time of the Global Settlement.

While we have no trouble finding that the first, second, fourth and fifth requirements of *res judicata* are met in this case, the third requirement that the parties be the same is the most problematic. We first consider the plaintiffs. In **UTNO/Arthur**, the plaintiffs were (1) UTNO, a labor union "whose membership includes teachers, counselors, social workers, paraprofessional employees, and clerical employees of the [OPSB];" (2) Germaine Arthur, a tenured teacher employed by the OPSB before her termination; (3) Kym Celestine, a non-tenured teacher employed by the OPSB before her termination; and (4) Wanda Gaudet, a tenured clerical employee of the OPSB before her termination. In **UTNO/Davis**, the plaintiffs were (1) UTNO,

26

a labor union "with its membership consisting of teachers and other employees of the [OPSB], who at all times herein are also citizen taxpayers domiciled in the State of Louisiana, and many of whom are parents of school-age children domiciled in [Louisiana and Orleans Parish];" (2) Tammy Davis, a citizen taxpayer; (3) Wanda Gaudet, as a citizen taxpayer and parent of a school-age child enrolled in a OPSB school; and (4) Valerie Prier, a citizen taxpayer. The plaintiff in *UTNO v. OPSB* was UTNO. The petitioners in the grievances that went to arbitration and settled in the Global Settlement were filed by UTNO on behalf of either "affected teachers," "affected paraeducators," or "affected clerical employees." The arbitrator described UTNO as "duly recognized as the exclusive bargaining representative for all full-time teachers, paraeducators and clerical employees" of the OPSB.

The plaintiffs in the instant suit were initially a few OPSB employees. By virtue of the district court's grant of class certification, the plaintiffs are represented by a class including:

> All current or former employees of the [OPSB] prior to Hurricane Katrina [August 29, 2005], who were terminated and/or forced to retire under the threat of termination from employment by the Orleans Parish School Board, and claim to have sustained economic injury and/or mental anguish and emotional distress as a result of termination and/or being forced to retire under the threat of termination from employment.

The class certification judgment offered subclasses for (1) tenured, certified teachers, (2) tenured, certified teachers promoted to positions of higher salary (management employees), (3) employees with "permanent status" other than classroom teachers, and (4) any of the above employees who were forced to retire. The Fourth Amending and Supplemental Petition seeking class certification filed on March 23, 2007, amended the caption naming the plaintiffs as "Eddy Oliver [a former tenured employee forced to retire by Act 35], Cynthia Jordan [a tenured, certified teacher], Karen Marks [a tenured, certified teacher], Antoinette Guillory [an employee with permanent status],

27

Barbara Jean Moore [a teacher promoted to a position of higher salary], Gwendolyn A. Ridgely [a tenured, certified teacher], Linda Pichon [an employee with permanent status], and Lois C. Lockhart [an employee with permanent status], Individually and on Behalf of all others similarly situated."

Regarding the individually named plaintiffs in the *UTNO* suits, as they are included in the class definition in this suit, their claims are precluded by *res judicata*. Regarding members of UTNO who are also included in the class definition of this suit, their claims are also barred. As stated above, UTNO filed the UTNO suits on behalf of its members, which include "teachers, counselors, social workers, paraprofessional employees and clerical employees of the [OPSB]." The class of plaintiffs in the instant case includes "all current or former employees of the [OPSB] prior to Hurricane Katrina [August 29, 2005], who were terminated and/or forced to retire . . ." The record does not reveal the exact overlap between the two, although the defendants represent that there is a total overlap.

If there are any remaining plaintiffs who are non-UTNO members, defendants contend that their interests so closely aligned with the UTNO plaintiffs in the dismissed lawsuits that they were adequately represented by those plaintiffs. In *Forum for Equality PAC v. McKeithen*,[39] we considered a constitutional challenge to 2004 La. Acts 926, which proposed a constitutional amendment defining "marriage" as a union between a man and a woman and which had been approved by the voters in September 2004. In that case, the Forum for Equality PAC, Lawrence E. Best, Jeanne M. LeBlanc and William A. Schultz sued the City of New Orleans and Secretary of State W. Fox McKeithen in Orleans Parish, claiming that the September 2004 election was constitutionally defective because it was not a "state-wide" election. A final

---

[39]04-2551 (La. 1/19/05), 893 So. 2d 738.

28

judgment issued, rejecting the plaintiffs' contention that the September 2004 election was not a state-wide election. In a second suit, the plaintiffs in the prior suit and new plaintiffs-Louisiana Log Cabin Republicans, Gerald Thibodeaux and Julie Jacobs-argued, among other things, that their claim was not barred by *res judicata* because there was no "identity of parties" as the new plaintiffs were not part of the prior litigation.

In *Forum for Equality*, we explained that "there exists an identity of parties whenever the same parties, their successors, or others appear so long as they share the same 'quality' as parties."[40] We summarized the scenarios in which a nonparty would be bound by a judgment, including the situation where "the nonparty's interests were adequately represented by a party to the action who may be considered the 'virtual representative' of the nonparty because the interests of the party and the nonparty are so closely aligned."[41] Finding that the new plaintiffs' interests were closely aligned with the plaintiffs in the first suit, we rejected their argument that *res judicata* did not preclude their claim that the September 2004 election was not a state-wide election.[42] While we find that any non-UTNO members were adequately represented by the UTNO plaintiffs, we recognize that they would have received no money from the Global Settlement. To the extent that such class members exist, we will address the merits of their claims later in this opinion.

Regarding the defendants, while the OPSB is obviously the same, defendants claim the State defendants were not parties to the Global Settlement and therefore, there is no identity of parties. The State defendants were parties to the ***UTNO/Davis***

---

[40]***Id.,*** 893 So. 2d at 745 (citing ***Welch v. Crown Zellerbach Corp.***, 359 So. 2d 154, 156 (La. 1978)).

[41]***Id.*** at 745.

[42]***Id.***

suit, in which the Global Settlement dismissed the OPSB with prejudice. However, the State defendants had previously been dismissed on an exception of no cause of action and this was affirmed on appeal.[43] That suit challenged the constitutionally of various provisions of Act 35, including La. R.S. 17:1990, which plaintiffs alleged impaired the obligations of UTNO and OPSB to each other as set forth in three CBAs. Further, the plaintiffs sought a declaratory judgment that "certain provisions contained in Act 35 of the First Extraordinary Session of the 2005 Louisiana legislature as unconstitutional," that the management of the OPSB schools be turned back over to the OPSB and the OPSB be ordered to abide by the terms of the CBAs, that the plaintiffs are "entitled to damages occasioned by the enactment of Act 35 causing the impairment of the contracts between the [OPSB] and [UTNO]," and all other "general and equitable relief." In affirming the trial court's grant of the exception of no cause of action in favor of the State defendants, the court of appeal held that the implementation of Act 35 did not impair the contractual obligation between UTNO and the OPSB, finding that La. R.S. 17:1990(B)(2)(a) "did not require the RSD to assume all of the employment-related obligations previously owed by OPSB, as the RSD was specifically given the authority to hire such staff as it deemed necessary, with the restriction that the RSD was to give priority consideration to certain teacher employees who were employed in the transferred school by the prior system. LSA-R.S. 17:1990(D)(1)."[44] The court of appeal found that the enactment of Act 35 was justified by a significant and legitimate public purpose, i.e., to regulate and improve the education provided to Louisiana throughout the state's public schools, and was

_____

[43] *United Teachers of America v. State Bd. of Elementary and Secondary Educ.*, 07-0031 (La. App. 1 Cir. 3/26/08), 985 So.2d 184, 192.

[44] *Id*. at 194.

reasonable and appropriate under the circumstances.[45]

The fact that the State defendants were not parties to the Global Settlement is of no moment, as the dismissal of the State defendants on an exception of no cause of action, along with the dismissal of the OPSB by virtue of the Global Settlement, constituted a final judgment for *res judicata* purposes. Thus, we find that identity of the parties was the same.

The plaintiffs argue that even if the elements of *res judicata* were met, the Global Settlement would be invalid under La. C.C.P. art. 594(A)(1) and (2), which require court approval and notice of the proposed settlement and settlement terms, as follows:

> (1) An action previously certified as a class action shall not be dismissed or compromised without the approval of the court exercising jurisdiction over the action.

> (2) Notice of the proposed dismissal of an action previously certified as a class action shall be provided to all members of the class, together with the terms of any proposed compromise that the named parties have entered into. Notice shall be given in such manner as the court directs.

The problem with this argument is that the Global Settlement occurred on September 18, 2007, and the class was not even certified until December 10, 2008, making the provisions of La. C.C.P. art. 594 inapplicable.

Having found that the elements of *res judicata* have been met, we now address whether "exceptional circumstances" preclude the application of *res judicata*. In the same bill that expanded *res judicata* in La. R.S. 13:4231, the Legislature created the exceptions to the general rule of *res judicata* in La. R.S. 13:4232.[46] La. R.S. 13:4232 provides:

A. A judgment does not bar another action by the plaintiff:

---

[45]***Id.*** at 196, 197.

[46]Acts 1990, No. 521, § 1, eff. Jan. 1, 1991.

31

(1) When exceptional circumstances justify relief from the res judicata effect of the judgment;

(2) When the judgment dismissed the first action without prejudice; or,

(3) When the judgment reserved the right of the plaintiff to bring another action.

B. In an action for divorce under Civil Code Article 102 or 103, in an action for determination of incidental matters under Civil Code Article 105, in an action for contributions to a spouse's education or training under Civil Code Article 121, and in an action for partition of community property and settlement of claims between spouses under R.S. 9:2801, the judgment has the effect of res judicata only as to causes of action actually adjudication.

The Official Comments note that the "exceptional circumstances" rule is a severely limited category where a court's discretion to apply the rule "must be exercised on a case by case basis and such relief should be granted only in truly exceptional cases, otherwise the purpose of res judicata would be defeated."[47]

The court of appeal agreed that the elements of *res judicata* were met, but refused to apply it to preclude plaintiffs' suit, finding that "even though the Union settlement may support preclusion under normal circumstances, the matter *sub judice* represents a truly exceptional situation as to warrant this Court's discretion in barring the application of res judicata pursuant to La. R.S. 13:4232."[48] The reasons the court of appeal found for applying the "exceptional circumstances" exception to *res judicata* included: (1) plaintiffs were asserting claims that had not previously been actually litigated or adjudicated; (2) the plaintiffs only received "minimal consideration" through the UTNO settlement; and (3) the OPSB did not seek dismissal of this case through the UTNO settlement.[49]

---

[47]La. R.S. 13:4232 Official Revision Comment (1990).

[48]*Oliver v. Orleans Parish School Board*, *supra* at 55.

[49]*Id.* at 55, 56.

This Court has never precisely delineated what constitutes "exceptional circumstances" for the purposes of avoiding the application of *res judicata*.[50] In *Terrebonne Fuel & Lube, Inc. v. Placid Refining Co.*,[51] we considered *res judicata* in the context of a prior filed federal bankruptcy proceeding where there was an express reservation of rights in the Plan of Reorganization which authorized the plaintiff-debtor to pursue any claims it might have against other parties. Because of this express reservation of rights, the later filed state court suit was not barred by *res judicata*. In that case, in explaining that there were exceptions to the application of *res judicata*, we cited as examples of exceptional circumstances those found in the Restatement (Second) of Judgments, § 26 (1982), pp. 233-34: (a) where the parties have agreed that the plaintiff may split his claim, or the defendant has acquiesced therein; (b) the court in the first action has expressly reserved the plaintiff's right to maintain the second action; (c) there are restrictions on the subject matter jurisdiction of the courts; (d) the judgment in the first action was plainly inconsistent with the fair and equitable implementation of a statutory or constitutional scheme; (e) for policy reasons; or (f) it is clearly and convincingly shown that the policies favoring preclusion of a second action are overcome for extraordinary reasons. While *Terrebonne* was decided under federal law, we noted in a footnote that the 1991 amendment adding La. R.S. 13:4232 "was also enacted to include similar exceptions. . ."[52] We find none of

---

[50]In *McClendon v. State, Dept. of Transp. and Development*, 94-0111 (La. 9/6/94), 642 So. 2d 157, while we mentioned the exceptional circumstances provision of La. R.S. 13:4232(A)(1), we ultimately held that statute did not apply because the judgment in the earlier case became final before the effective date of that statute.

[51]*Terrebonne Fuel & Lube, Inc. v. Placid Refining Co.*, 95-0654 (La. 1/16/96), 666 So. 2d 624.

[52]*Id.* at 632, n. 4.

those factors are present in this case.

Further, it is clear that none of the factors cited by the court of appeal would constitute "exceptional circumstances." The fact that the claims asserted in this case were not actually litigated or adjudicated in prior suit is of no moment under the 1991 amendment to La. R.S. 13:4231, as the test is now whether the second action asserts a cause of action which arises out of the transaction or occurrence which was the subject matter of the prior action. La. R.S. 13:4232 only provides an exception from the application of *res judicata* where a cause of action has actually been litigated in an action between spouses under La. R.S. 9:2801.[53] The fact that the plaintiffs only received "minimal consideration" in the UTNO settlement is also not an exceptional circumstance. For even if the $7 million received in the settlement could be characterized as "minimal consideration," the application of *res judicata* cannot be avoided every time a party thinks it should have received a larger damage or settlement award. Lastly, the fact that this suit was not particularly dismissed in the Global Settlement is not an "exceptional circumstance" as La. R.S. 13:4232(A)(3) requires a specific reservation of rights to allow a plaintiff to bring another action, which did not occur here.

**Due Process**

Even assuming that the requirements of *res judicata* have not been met, or have not been met as to the plaintiffs who were not members of UTNO, we still find that plaintiffs' claims should be dismissed because there were no due process violations. The Fourteenth Amendment to the United States Constitution provides, in pertinent part, "nor shall any state deprive any person of life, liberty or property, without due

---

[53]La. R.S. 13:4232(B).

process of law."   In addition, La. Const. Ann. art. I,§ 2 provides "[n]o person shall be deprived of life, liberty, or property, except by due process of law."  Due process encompasses both substantive and procedural aspects.   In order to prove a violation of substantive due process, a defendant "must first establish the existence of a constitutionally-protected property or liberty interest."[54]  "Procedural due process requires that before an individual is deprived of a property or liberty right, the individual must be provided with notice and an opportunity to be heard."[55]  Existing rules or understandings stemming from independent sources such as state law create and shape what property interests are subject to due process protection under the Fourteenth Amendment.[56]

To obtain protection under the due process clause, a person must have more than an abstract need or desire for the liberty or property interest and must have more than a unilateral expectation of the interest; instead, the person must have a legitimate claim of entitlement to the interest.[57]   Further, "a property must have some ascertainable monetary value."[58]

We first address the claims against the OPSB.  The court of appeal found that the OPSB was permitted to implement the RIF, given the circumstances following Hurricane Katrina resulting in the automatic transfer of the majority of the OPSB schools to the RSD pursuant to Act 35.[59] But the court found that the class members

---

[54]*State v. Bazile*, 12-2243 (La. 5/7/13), 144 So. 3d 719, 730 (citing *State v. Weaver*, 01-467 (La. 1/15/02), 805 So. 2d 166, 173).

[55]*Id.* at 732 (citing *State v. Golston*, 10-2804 (La. 7/1/11), 67 So. 3d 452, 463).

[56]*Denham Springs Economic Development Dist. v. All Taxpayers, Property Owners and Citizens of Denham Springs Economic Development Dist.*, 05-2274 (La. 10/17/06), 945 So. 2d 665, 682.

[57]*Id.* at 681.

[58]*Id.*

[59]*Oliver v. Orleans Parish School Board*, *supra* at 44, 45.

had a "substantive right to be recalled," which the OPSB violated by failing to create a recall list as required by Personnel Policy 4118.4(D). Finding that the policy was that employees affected by the RIF had recall rights for two years, "[i]n failing to create the Recall List, [the class members] lost the opportunity for employment for a minimum of two years;" therefore, the court affirmed the trial court's finding that OPSB violated their "due process rights.

The RIF was legal pursuant to Act 35, thus there is no question that the OPSB was authorized to layoff over 7,000 employees. The plaintiffs claim they had state-mandated employment and property rights that guaranteed they could only be terminated for cause-immorality, willful neglect of duty, or incompetence-and only after various due process procedures were followed (the same Teacher Tenure Laws they claimed were violated in the UTNO suits). However, the Teacher Tenure Laws did not envision, nor provide for, the circumstance where a massive hurricane wipes out an entire school district, resulting in the elimination of the vast majority of teaching positions in that district. It would defy logic to find the OPSB liable for a due process violation where jobs were simply not available. As one commentator has noted, "the Teacher's Tenure Law was not meant to guarantee job security where there were no jobs."[60]

Further, due to the unique issues presented by Hurricane Katrina, even had a recall list been in place, there were only 526 positions available for the over 7,000 class members here. There is no legal theory which would allow over 7,000 teachers to recover back pay when only 526 could even theoretically be able to show they would have been hired if a recall list had been in place. While the OPSB did not have a recall list, OPSB set up an employee hotline to communicate to displaced workers and to

---

[60]Baier, Paul R., Work of the Appellate Courts 1974-75: Administrative Law and Procedure, 36 La. L. Rev. 464, 469 (1976).

begin to determine which employees could return to work when the schools re-opened. The Call Center operated 24 hours per day and allowed the employees to inform the OPSB as to whether they intended to return to work, and their names were placed on a list. This method was not perfect and did not technically amount to a recall list. However, as the Fourth Circuit has recognized in at least five other cases, the "process" afforded by the City to civil servants in the wake of Hurricane Katrina, while imperfect, was not constitutionally deficient in light of the extraordinary challenges the City of New Orleans faced.[61] Similarly, we find that while this method of attempting to rehire teachers was not perfect, it was sufficient to satisfy due process.

In addition, even had the lack of a recall list been somehow constitutionally deficient, the plaintiffs presented no evidence of a specific class member who would

---

[61]*Joe Banks, et al. v. The City of New Orleans, et al.*, unpubl., 05-1513 (La. App. 4th Cir. 5/3/06) (the imperfect process one civil servant received when he was laid off during the City's reduction in force following Hurricane Katrina was sufficient in light of the City's inability to sustain its workforce and the enormous task of eliminating all personnel not absolutely critical to the City's recovery); *Reed v. Department of Police*, 06-1498 (La. App. 4th Cir. 10/10/07), 967 So. 2d 606, 610 ("[w]e hold that Hurricane Katrina, with its effects upon the City of New Orleans and its government, was an extraordinary event such that the NOPD could discipline officers without a pre-termination hearing"), *writs denied, Washington v. Department of Police*, 07-2103 (La. 1/11/08), 972 So. 2d 1164, *Winford v. Department of Police*, 07-2181 (La. 1/11/08), 972 So. 2d 1165, *Allen v. Department of Police*, 07-2439 (La. 2/15/08), 976 So. 2d 182, *Lee v. Department of Police*, 07-2440 (La. 2/15/08), 976 So. 2d 182, and *rev'd on other grounds*, *Madison v. Department of Police*, 07-2405 (La. 4/4/08), 978 So. 2d 288 (reversing on other grounds but noting that this Court denied writs in the other individual cases consolidated with *Reed* by the court of appeal because we rejected the police officers' arguments that the post-termination hearings provided after Hurricane Katrina were insufficient to satisfy due process); *Johnson v. Department of Police*, 07-1167 (La. App. 4 Cir. 12/5/07), 972 So. 2d 1263, 64 ("[t]his Court found that Hurricane Katrina, with its effects upon the City of New Orleans and its government, was an extraordinary event such that the Department could discipline its officers without a pre-termination hearing"); *Scott v. Div. of Housing & Neighborhood Development*, 08-0068 (La. App. 4 Cir. 8/6/08), 991 So. 2d 558, 562 ("it is uncontested that pre-termination hearings were not feasible for the civil servants subject of the post-Katrina layoff at issue") *writ denied*, 08-2134 (La. 11/14/08), 996 So. 2d 1091; *Aubert v. Department of Police*, 09-0288 (La. App. 4 Cir. 8/26/09), 19 So. 3d 1211, 1219 ("[o]ur law is now clear that the post-Katrina hearing which took place after, rather than before, the appellant's deprivation of her job was sufficient during the extraordinary circumstances of the disaster-struck city"), *writ denied*, 09-2103 (La. 11/25/09), 22 So. 3d 167.

have been rehired by the OPSB had a recall list been in place.[62] The evidence showed

that of the hires the OPSB ultimately made, approximately 90% were former OPSB

employees.[63]

Addressing the liability of the RSD, after reversing the district court's findings

that the State was liable in partnership with the OPSB and independently liable for

tortious interference with contract, the court of appeal found that the State violated

plaintiffs' due process rights by failing to give them priority consideration.[64] The court

of appeal found that there was "absolutely no evidence that qualified Appellees [sic]

were provided the consideration mandated by statute," and that instead, the State

advertised for the positions nationally and "contracted with Teach for America to hire

inexperienced college graduates that did not have teacher certification."[65]

As stated, a "person must have a legitimate claim of entitlement to the interest"

which he claims was violated in order to have protection under the due process

clause.[66] A "court must carefully scrutinize statutory language before finding a

property interest created by the statute . . ."[67] La. R.S. 17:1990(D)(1) gives the RSD

total discretion to hire "such staff members as it deems necessary." If "a certified

teacher with regular and direct responsibility for providing classroom instruction to

---

[62]In *Marks v. New Orleans Police Department,* 06-0575 (La. 11/29/06), 943 So. 2d 1028, the police department failed to comply with the statutory 60-day time period for conducting an investigation of a police officer. We found that while a delay beyond the statutory period which unfairly prejudices the officer may implicate the due process clause, here there was no showing of prejudice and thus no due process violation. 943 So. 2d at 1036, n. 7.

[63]Of plaintiffs' seven class representatives, two never applied to be rehired by either OPSB or RSD-one testified she never even called the OPSB's call center after the storm, the other testified she would not have taken an OPSB job if it had been offered to her-two were hired by the RSD and one was hired by a charter school.

[64]*Oliver v. Orleans Parish School Board, supra*

[65]*Id.* at 48.

[66]*Denham Springs, supra* at 682.

[67]*Id.*

students" from a failing school applies, that teacher must be given "priority consideration" for hiring. The RSD is not required to hire any of these teachers, and is not required to hire any of these teachers in preference to any other applicants: it must simply give them priority "consideration." There is no due process claim in a procedure concerning employment that does not require a mandated outcome.[68] These teachers have no "legitimate claim of entitlement" to employment with the RSD and there is no "ascertainable monetary value" to "priority consideration;" thus no property interest protected by the due process clause.

Even if the teachers had a property interest in employment with the RSD, the only evidence they produced that priority consideration was not given to them was that the RSD signed a contract with Teach for America resulting in the hiring of 125 teachers, and advertised nationally for the positions. This does not amount to proof that the OPSB teachers were not given priority consideration, and, the trial court made no factual findings that any teachers were denied priority consideration. Instead, the evidence showed that the RSD did give priority consideration to former OPSB teachers pursuant to a process whereby all applicants took a skills assessment, and those OPSB employees who passed were placed in a separate pool to be considered before any of the non-OPSB employees who passed the test. Further, the evidence showed that the purpose of the advertisements was to get the former OPSB employees back to work in the RSD schools.

## CONCLUSION

*Res judicata* applies where a second action asserts a cause of action which arises out of the transaction or occurrence which was the subject matter of a prior action. This class action suit asserts causes of action arising out of the OPSB and

---

[68] ***Ripley v. Wyoming Medical Center, Inc.***, 559 F.3d 1119, 1125 (10th Cir. 2009), *cert. denied*, 558 U.S. 879, 130 S.Ct. 287, 175 L.Ed.2d 135.

State's actions in placing the class members on disaster leave, terminating them allegedly in violation of their employment contracts, Teacher Tenure Law and OPSB policy, placing the schools in the hands of the RSD, and failing to abide by certain statutes in staffing the RSD schools, all as a result of Hurricane Katrina and the implementation of Act 35. The UTNO suits and arbitrations all arise out of that same occurrence; in fact, some of the causes of actions are exactly the same as those in this class action. We agree with the court of appeal that *res judicata* applies here but find no "exceptional circumstances" which would preclude its application. We recognize it is possible that there are some members of the class who were not members of UTNO at the time of the UTNO suits and Global Settlement. To the extent that *res judicata* would not apply to any of the parties in this case, we find that neither the OPSB nor the State defendant's violated the class members' due process rights. Lack of a recall list does not constitute a due process violation, the procedures used by the OPSB to locate their employees after Katrina was sufficient to meet due process standards, and the vast majority of those rehired by the OPSB were former OPSB employees. Finally, there is no constitutionally protected property interest in the right to "priority consideration" for employment with a third party, and the plaintiffs offered no proof they were not given priority consideration

## DECREE

For the reasons stated herein, the judgments of the lower courts are reversed and this class action suit is dismissed.

**REVERSED AND RENDERED.**

10/31/14

SUPREME COURT OF LOUISIANA

No. 2014-C-0329

CONSOLIDATED WITH

No. 2014-C-0330

*EDDIE OLIVER, OSCARLINE NIXON AND MILDRED GOODWIN*

*VERSUS*

*ORLEANS PARISH SCHOOL BOARD*

**ON WRIT OF CERTIORARI TO THE COURT OF APPEAL,
FOURTH CIRCUIT, PARISH OF ORLEANS**

**JOHNSON**, **Chief Justice, dissents and assigns reasons.**

I respectfully dissent from the majority opinion in this case, which dismissed the class action claims of the Orleans Parish School Board ("OPSB") teachers and employees who were subjected to mass termination immediately following Hurricane Katrina. The majority finds that plaintiffs' claims are barred by *res judicata*, and further held that even if *res judicata* did not apply, the defendants did not violate the plaintiffs' due process rights. I disagree.

The defendants' *res judicata* claim was based on a September 18, 2007 settlement agreement between the OPSB and the United Teachers of New Orleans ("UTNO"), which specifically dismissed several lawsuits and arbitration proceedings filed by UTNO asserting violations of their collective bargaining agreements. The majority erroneously finds that the dismissal of these completely separate actions provides a basis for *res judicata*. Five elements must be satisfied for a finding that *res judicata* applies to bar a second action: (1) the judgment is valid; (2) the judgment is final; (3) the parties are the same; (4) the cause or causes of action asserted in the second suit existed at the time of final judgment in the first litigation; and (5) the cause or causes of action asserted in the second suit arose out

of the transaction or occurrence that was the subject matter of the first litigation.[1] It is well established that the doctrine of *res judicata* is *stricti juris*, and any doubt concerning the application of the principle must be resolved against its application.[2] In my mind, defendants' *res judicata* claim must fail because the 2007 OPSB-UTNO settlement agreement did not include the pending *Oliver* class action case, involved entirely different claims from those involved in the *Oliver* class action suit, and did not involve the same parties.

While a valid compromise may form the basis of a plea of *res judicata*, "a party claiming *res judicata* based on a compromise agreement must have been a party to the compromise, and the authority of the thing adjudged **extends only to the matters those parties intended to settle**.[3] There is no question that the *Oliver* class action was not part of the 2007 settlement agreement and that there was no intent to dismiss the class action claims set forth in this class action suit. The 2007 settlement agreement resolved three specific lawsuits and three specific arbitration proceedings between UTNO and the OPSB related to the OPSB's violation of the collective bargaining agreements that were in effect at the time of Hurricane Katrina. The *Oliver* suit was not included as one of the three suits specifically made part of the settlement agreement. This is particularly noteworthy because at the time of the OPSB-UTNO settlement, the *Oliver* class action litigation had been active for approximately two years and although *Oliver* was pending at the time of settlement, the OPSB did not seek to have the litigation dismissed through the 2007 settlement. Notably, the OPSB's own witness, OPSB Superintendent Darryl Kilbert, testified that he did not consider the *Oliver* class action a part of the OPSB-UTNO settlement agreement. Further, "when the words of the contract are

---

[1] *Burguieres v. Pollingue*, 02–1385 (La. 2/25/03), 843 So. 2d 1049, 1053.

[2] *Kelty v. Brumfield*, 93-1142 (La. 2/25/94), 633 So. 2d 1210, 1215.

[3] *Ortega v. State, Dept. of Transp. and Development*, 96-1322 (La. 2/25/97), 689 So. 2d 1358, 1363. (Emphasis added).

clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[4] The 2007 settlement between the OPSB and UTNO is clear and explicit, requiring a strict interpretation as written. This court "has repeatedly explained that it is not within the province of courts to relieve parties of what they later decide is a 'bad bargain.' Thus, if the contract agreement is not ambiguous, the party arguing ambiguity is still bound by its terms, even if it no longer likes the terms."[5] The *Oliver* suit is not referred to anywhere within the "four corners" of the OPSB-UTNO settlement. Thus, the majority improperly uses the OPSB-UTNO settlement as the basis to dismiss the class action claims of the *Oliver* plaintiffs.

Moreover, the UTNO-OPSB settlement agreement and the *Oliver* litigation clearly involve entirely separate claims. The 2007 settlement agreement involved limited claims arising out of collective bargaining agreements in place at the time of Hurricane Katrina, while the *Oliver* litigation involves claims of wrongful termination of tenured staff and teachers, as well as damages. Notably, the *Oliver* plaintiffs made clear that the suit was separate from any of the cases implicated in the UTNO-OPSB settlement agreement by stating the following in the petition:

> *DISCLAIMER: Plaintiffs do not represent members of a collective bargaining organization with the exception of the Professional Administrators of New Orleans Public Schools (PANOPSJ) and the request herein for "class action" status (including "teachers" or "para-educators") shall in no way implicate any such representation.*

Additionally, the settlement amount in the 2007 agreement constitutes only a fraction of that sought in the *Oliver* class action. The *Oliver* suit involves full compensation for the OPSB employees terminated and not recalled or rehired after

---

[4] La. C.C. art. 2046.

[5] *John Paul Sapir, LLC v. Yum! Brands, Inc.*, 12-0824 (La. App. 4 Cir. 12/5/12), 106 So. 3d 646 (citing *Mahoney v. Oak Builders, Inc.*, 256 La. 85, 97, 235 So.2d 386, 390 (1970)).

Hurricane Katrina. Thus, the class action suit compensates for losses such as the employees' earning capacity. Union members were offered only $1000.00 as part of the OPSB-UTNO settlement to compensate for the failure of the OPSB to comply with the collective bargaining agreements and pay certain benefits of union members.

Furthermore, I find there is no identity of parties in the 2007 settlement agreement and the *Oliver* class action litigation. While plaintiffs admit there is some small margin of overlap between the class members in *Oliver* and union members set to receive damages as a result of the OPSB's violation of the collective bargaining agreements, clearly none of the *Oliver* plaintiffs contemplated dismissal or compromise of their wrongful termination claims as part of the 2007 settlement agreement. And, the 2007 settlement agreement clearly did not include the state defendants as parties, whereas the state defendants were made parties to the *Oliver* suit due to their alleged collusion with the OPSB. While the majority finds this fact to be of "no moment," I cannot agree.

I also believe the principle of *res judicata* should be balanced with the interests of justice. As recognized by the court of appeal, application of *res judicata* should be denounced when the issues in the case were never settled, litigated, or adjudicated.[6] The court of appeal aptly noted that when addressing employment lawsuits, courts have been critical of union proceedings waiving or barring an employee's right to seek judicial review of claims arising out of state and/or federal statutes.[7] The United States Supreme Court has recognized the

---

[6] *Oliver v. Orleans Parish School Bd.*, 12-1520 (La. App. 4 Cir. 1/15/14), 133 So. 3d 38, 54 (citing *Igbokwe v. Moser,* 12–1366 (La. App. 4 Cir. 4/24/13), 116 So. 3d 727, 731 *writ denied,* 13–1196 (La. 9/13/13), 120 So. 3d 698; *Fine v. Regional Transit Auth.,* 95–2603 (La. App. 4 Cir. 6/26/96), 676 So. 2d 1134, 1137; *Schneidau v. Vanderwall,* 08–1274 (La. App. 5 Cir. 5/26/09), 17 So. 3d 61, 64; B*illiot v. LeBeouf Brothers Towing Co.,* 93–1697 (La. App. 1 Cir. 6/24/94), 640 So .2d 826); *Ortiz v. Ortiz,* 01–1252 (La. App. 5 Cir. 05/15/02), 821 So.2d 35, 38; *Brouillard v. Aetna Cas. and Surety Co.,* 94–1559 (La. App. 3 Cir. 5/10/95), 657 So. 2d 231, 233).

4

"deep-rooted historic tradition that everyone should have his own day in court."[8] Thus, even if *res judicata* is applied in this case, I must disagree with the majority's finding that no exceptional circumstances exist that would preclude its application. Louisiana law specifically provides for an "exceptional circumstances" exception to the application of res judicata.[9] La. R.S. 13:4232(A)(1) "provides discretion to decline preclusion and lends authority to the notion of not using the *res judicata* scythe to deny a litigant his rights.[10] As correctly found by the court of appeal, "it would be inequitable, unjust, and illogical to find that the minimal consideration received by the employees through the Union settlement would bar or waive their right to have their claims litigated and adjudicated through judicial proceedings. [T]he Board was fully aware that this case was pending prior to the Union settlement and did not seek dismissal at that time."[11] "While *res judicata* is a useful tool, it should not be used as a scythe applied mechanically to mow down claims where the party asserting the claim is not at fault for the lack of adjudication of that claim in the first suit.[12]

Finally, I find the majority errs in finding there were no due process violations. I agree with court of appeal's finding that the *Oliver* plaintiffs were deprived of their constitutionally protected property right to be recalled to employment without due process of law. This court has held that Teacher Tenure

---

[7] *Oliver*, 133 So. 3d at 52 (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed. 2d 147 (1974); *Clukey v. Town of Camden*, 717 F.3d 52 (1st Cir. 2013)).

[8] *See Richards v. Jefferson Cnty., Ala.,* 517 U.S. 793, 798, 116 S.Ct. 1761, 1766, 135 L.Ed. 2d 76 (1996)(quoting *Martin v. Wilks,* 490 U.S. 755, 761–762, 109 S.Ct. 2180, 2184, 104 L.Ed. 2d 835 (1989))(citing 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4449, p. 417 (1981)).

[9] *See* La. R.S. 13:4232(A)(1).

[10] *Oliver,* 133 So. 3d at 53. (Internal citation removed).

[11] *Id*. at 56.

[12] *Terrebonne Fuel & Lube, Inc. v. Placid Ref. Co.,* 95–0654 (La. 1/16/96), 666 So. 2d 624, 635; *see also* M. David Kurtz and Mark W. Frilot, *Res Judicata in Louisiana: A Synthesis of Competing Interests,* 53 La. B.J. 445 (2006).

Laws should be liberally construed in favor of their primary beneficiaries, tenured employees.[13] Additionally, this court has held that a school board must adhere to the procedures set forth in the Teacher Tenure Law.[14] It is well established that a teacher's right in employment is a statutorily created vested property right protected by federal and state constitutions, requiring that certain procedural steps are followed before a teacher is terminated.[15]

At the time of the Reduction in Force ("RIF"), La. R.S. 17:81.4 required the OPSB to adhere to minimum standards when reducing workforce. The plaintiffs were denied due process because they were entitled to, but not afforded, the procedural protections of the OPSB's Policy. The OPSB Personnel Policy 4118.4-R is consistent with the requirements of La. R.S. 17:81.4. The policy provided that if an OPSB employee is discharged due to a RIF, after receiving notice, the employee is entitled to a grievance hearing or appeal. The trial court found that no member of the plaintiff class received any type of grievance hearing after the RIF notice was distributed. Furthermore, OPSB Personnel Policy 4118.4-R required that a mandatory recall list be created to fill vacant positions resulting from a RIF. The OPSB clearly violated its own policy by not creating the required recall list.

In my view, the record supports plaintiffs' claims of due process violations. As found by the trial court, "rather than honoring the vested property interest held by experienced teachers qualified under Louisiana's standard, the State conducted a nationwide teacher search to fill vacancies with the RSD, and, among other things, contracted with Teach for America to hire inexperienced and non-certified college graduates, thereby preventing the plaintiff class from exercising their legally protected property rights."

---

[13] *Howell v. Winn Parish Sch. Bd.*, 332 So. 2d 822, 827 (La. 1976).

[14] *Spears v. Beauregard Parish School Board*, 02-2870 (La. 6/27/03), 848 So. 2d 540.

[15] U.S.C.A. Const. Amend. 14; La. Const. art. 1, § 2; La. R.S. 17:443.

For the reasons stated herein, I dissent from the majority opinion and would affirm the ruling of the court of appeal.

# SUPREME COURT OF LOUISIANA

## No. 2014-C-0329

## CONSOLIDATED WITH

## No. 2014-C-0330

### *EDDIE OLIVER, OSCARLINE NIXON AND MILDRED GOODWIN*

### *VERSUS*

### *ORLEANS PARISH SCHOOL BOARD*

## ON WRIT OF CERTIORARI TO THE COURT OF APPEAL, FOURTH CIRCUIT, PARISH OF ORLEANS

**GUIDRY, Justice, additionally concurs and assigns reasons.**

The impact of Hurricane Katrina and its aftermath upon the citizens of New Orleans and the State of Louisiana was devastating and will be long-lasting. Equally affected were the plaintiffs, dedicated teachers and employees of the Orleans Parish School Board. Nevertheless, the facts of the case before us, and the law of this state, compel the result reached by the majority.