HAMITER, Justice.
 

 The State Board of Commerce and Industry, together with its members, is appealing from a judgment decreeing “that the alternative writ of mandamus herein issued be made peremptory, and, accordingly, that there be judgment in favor of Kohler’s Snowite Laundry & Cleaners, Inc., Relator, and against State Board of Commerce and Industry, and the individual members thereof, commanding and directing said State Board of Commerce and Industry to recommend to the Honorable Sam Ii. Jones, Governor of the State of Louisiana, the granting to Kohler’s Snowite Laundry & Cleaners, Inc., of the tax exemption nunc pro tunc as of October 4th, 1938, as prayed for by Relator and in accordance with the formal contract tendered by Relator to said Board, a copy of which is on file in these proceedings; and if the granting of said exemption is approved by said Honorable Sam H. Jones, Governor of
 
 *625
 
 the State of Louisiana, then that said State Board of Commerce and Industry be further commanded and directed to enter into and sign said contract of exemption.”
 

 By Act No. 68 of 1936, the Legislature proposed an amendment to the Constitution of this State so as to add to Section 4 of Article X the following sub-section:
 

 “The Governor, or the State Board of Commerce and Industry (if that Board is created by law), with the approval of the Governor,
 
 may contract
 
 with the owners of
 
 any new industry
 
 to be established in the State, or an addition or additions to any industry or industries already existing in the State,
 
 for the exemption from taxation of any such new industry
 
 or any addition to any such existing industry, upon such terms and conditions as the Governor, or said board with the approval of the Governor, may deem to the best interests of the State; provided, that no exemption from taxes shall be granted under this paragraph for a longer period than the ten (10) calendar years succeeding the date of any such contract. Any such exemption shall ‘ipso facto’ cease upon violation of the terms and conditions of any contract hereby authorized.” (Italics ours)
 

 This proposal, which we shall herein■after refer to as the 1936 amendment, was approved and adopted by the state’s electorate on November 3, 1936.
 

 Also, at the legislative session of 1936, there was created within the Executive Department of the State, by Act No. 19, the Department of Commerce and Industry. 'This department, as the statute provided, '“shall be governed by a Board, which shall consist of twelve members, to be appointed by the Governor. They shall receive no compensation for their services other than a reasonable per diem, to be fixed by the Board, and the amount of their traveling and other expenses actually incurred while in the performance of their official duties, all of which shall be approved by the Governor.” Further, “the duties of the Board shall be to promote the civic, industrial, and commercial interests and the general welfare of the State, and, particularly, to attract new industries to the State.”
 

 A reading of the 1936 amendment in connection with Act No. 19 of 1936 clearly discloses that the granting of a tax exemption to a new industry was to be done under contract by the Governor, or by the State Board of Commerce and Industry with the Governor’s approval, when and only when it appeared that such action would promote the general welfare of the state. Furthermore, in view of the use of the phrase “may contract”, we observe that the Governor and Board were vested with wide discretion in their efforts to attract industries to this state; their executing of a contract with any new industry that applied for the tax relief was not made mandatory.
 

 In the spring of 1938, Max N. Kohler commenced to organize the relator corporation, of which he subsequently became president, and in his organization efforts he represented, as one of the principal inducements to subscribers for stock, that the proposed venture would be entitled to the tax exemption provided for in the 1936 amendment. Formation of the corpora
 
 *627
 
 tion, as an entirely new enterprise and the purpose of which was to engage in the laundry business in the City of New Orleans, was completed on or about September IS, 1938.
 

 On October 4, 1938, relator’s then attorney (it is now represented by other counsel) enclosed in a letter addressed to the respondent board an application for tax exemption for the corporation, together with two copies of the proposed contract signed by relator’s vice president. The contract stipulated an exemption equaling the total cost of the new industrial plant, estimated to be $66,600.
 

 On the following day, Ernest Lee Jahncke, executive director of the Department of Commerce and Industry, replied to that letter by stating, after acknowledging its receipt, as follows:
 

 “For your information the Board of Commerce and Industry has adopted a definite ruling limiting approval of tax exemption under Act 68 to manufacturing establishments. This ruling was adopted in order to conform with the expressed wishes of the 1938 regular session of the State Legislature as expressed in Act 37.
 

 “Inasmuch as a laundry and cleaning establishment cannot be classed as a manufacturer, your application, under the rules, will not be eligible for consideration.”
 

 The definite ruling or policy referred to had been adopted by the board a few days prior to September 22, 1938, on the advice of an assistant attorney general in the Department of Justice of this state. The counsel of that official had been sought when it was learned that the Legislature of 1938, by the passage of the mentioned Act No. 37 was submitting to the electorate of the State a proposal to change the 1936 amendment, the change, among other things, being to make the exemptions obtainable only by manufacturing establishments.
 

 The electors in November, 1938, approved the proposal submitted under Act No. 37 of 1938; but the change did not become effective until December 9, 1938, or twenty days after the issuance of the Governor’s proclamation. Hence, the effective date of the 1938 amendment was more than two months after the filing of relator’s application for the tax exemption.
 

 On receiving the executive director’s communication of October 5, 1938, Mr. Kohler conferred with A. B. Patterson, the then chairman of the respondent board; and on October 11, 1938, Mr. Patterson addressed a letter to the executive director, stating:
 

 “Mr. Kohler’s presentation of the situation seems very logical and I cannot spe why his firm should not be given the same consideration as the concern in Alexandria. I, therefore, would appreciate your asking Judge Wallace for another ruling on this because, as I understand it, it was his office that ruled we would not be justified in granting tax exemption to the Kohler Snow White Laundry and Cleaner Corporation.
 

 “In view of the exemption granted to the Blackman Laundry and Dry Cleaners and the promises Mr. Kohler made his subscribing stockholders because of the
 
 *629
 
 precedent established in Alexandria, I think we should do everything we can to aid him in securing the exemption he is seeking.”
 

 The board, following receipt of this letter, considered relator’s application; but at a meeting on June 29, 1939, it was rejected.
 

 Relator continued to press its demands for the exemption, and, as a consequence, the board called upon the State Department of Justice for further legal advice. In his letter of September 12, 1939, to the executive director, the second assistant attorney general, Lessley P. Gardiner, advised :
 

 “A plant which is used as a laundry and dry cleaning establishment does not, in our opinion, fall within the definition of a manufacturing establishment set forth in Act 37 of 1938 and we are therefore of the opinion that the Board cannot legally approve the application for exemption of the Kohler Sno-Wite Laundry and Cleaners, Inc.”
 

 Another written legal opinion on the subject, but one expressing an entirely different view, was received by the executive director from the Department of Justice under date of August 15, 1940. It was written and signed by W. Carruth Jones, executive assistant to the attorney general, from which the following is quoted:
 

 “At the request of Mr. Eldon S. Lazarus, Attorney, we have reviewed the correspondence file you so kindly forwarded to us in the matter of the application of the client of Mr. Lazarus, Kohler’s Snowite Laundry & Cleaners, Inc., of New Orleans, for exemption from taxation as a new industry, under the provisions of Paragraph 10 of Section 4 of Article X of the Constitution of Louisiana, as amended by Act 68 of 1936.
 

 “This application was received by the Department of Commerce & Industry on October 5, 1938, at which time the amendment of Section 4 of Article X of the Constitution, as amended by Act 68 of 1936, was in full force and effect as to the exemption of new industries in this' State. * * *
 

 “The application in question was timely filed and while the Department had the discretion to grant or refuse the application, under the terms of the law, it did not have the authority to delay action on the application until after the new amendment had become effective. * * *
 

 “On the whole, this matter is bristling with equities in favor of the granting of the application for the tax exemption on the part of the Kohler’s Snowite Laundry & Cleaners, Inc.
 

 “After a thorough consideration of the action of the Department of Commerce & Industry relative to this application, and considering the equities in favor of the applicant, Kohler’s Snowite Laundry & Cleaners, Inc., together with the wide discretionary powers possessed by such Department, it appears to me that the Department might, under the circumstances, reconsider the application and, if possible, correct a seeming injustice to the applicant.”
 

 
 *631
 
 Notwithstanding this last ruling of the attorney general’s office, the board, at its meeting on September 19, 1940, again registered a refusal of the application.
 

 Later, however, it reconsidered relator’s request; and on April 22, 1941, G. T. Owen, then the board’s executive director, notified in writing the corporation’s present counsel as follows:
 

 “Tax exemption application in the case of Kohler’s Sno-Wite Laundry & Cleaners, Inc., New Orleans, Louisiana, was rejected by the State Board of Commerce and Industry, June 29, 1939.
 

 “You requested reconsideration on this application and the case was presented to the members of the State Board of Commerce and Industry, at their meeting, April 15, 1941, in accordance with your request, and after careful consideration by the members it was their decision to reject the application.
 

 “Rejection of this application was based on the fact that the business, in which Kohler’s Sno-Wite Laundry & Cleaners, Inc., is engaged is locally competitive. To grant tax exemption in this case would have enabled the applicant to operate with an unfair preferential over other local industries engaged in the same type business, who do not enjoy the privilege of tax exemption.”
 

 On September 18, 1941, relator sought a further rehearing, appearing before the board through its president and attorney, and again the application was rejected.
 

 This mandamus proceeding followed the last mentioned appearance and refusal. It was commenced by relator on December 5,. 1941, and its purpose is to compel the board to recommend to the Governor the-granting of the desired tax exemption and to enter into and sign the necessary contract when and if the Governor gives his. approval. As before stated, the district court made peremptory the alternative writs of mandamus previously issued; and the cause is before us on an appeal from, that judgment.
 

 It is not denied by relator, in fact its counsel concede, that the matter of recommending the tax exemption was within the sound discretion of the members of the Board of Commerce and Industry. Furthermore, with respect to the discretion granted a public agency, counsel recognize the law to be, to quote from, their brief, that:
 

 “Unquestionably, as a general proposition, a public board is not subject to. mandamus to compel it to perform in a certain way a duty which lies solely within its discretionary powers. However, this rule is subject to 'the very definite qualification that there must not be an arbitrary,, unjust or capricious exercise of that discretion. If the discretion is so abused to. the damage, injury, and prejudice of the relator, the Courts of this State not only have the power, but will not hesitate by a writ of mandamus, to correct such abuse.”
 

 This legal principle was enunciated and followed in State ex rel. People’s State-Bank v. Police Jury of Red River Parish et al., 154 La. 389, 97 So. 584; and it is. well stated in the following extract taken
 
 *633
 
 from 34 American Jurisprudence, verbo Mandamus, § 126:
 

 “As in other cases, the writ will not issue to control judgment or discretion. Where judgment or discretion is reposed in an administrative agency and has by that agency been exercised, courts are powerless by the use of the writ of mandamus to compel a different conclusion, unless there has been a clear abuse of discretion. So long as they act within the law and do not abuse the discretion reposed in them, they are subject to no control save that of the legislature. * *
 

 But relator insists, and the trial judge found, that the evidence adduced on the trial of this case shows an arbitrary, discriminatory and capricious abuse of the board’s discretion in acting upon relator’s application, a situation within the contemplation of the stated exception to the general rule.
 

 Appellants’ counsel, in opposing the demands of relator here, first urges numerous preliminary exceptions and objections, some of which were offered in the district court. These we deem unnecessary to consider in view of our decision on the primary issue presented, it being whether or not there has been a clear abuse, as charged by relator, of the discretionary power vested in the board.
 

 Undoubtedly, the board’s refusals of the application occurring on October 5, 1938, and June 29, 1939, had as their basis a mistaken view of the law. A few days previous to September 22, 1938, the board, having knowledge of the legislative action respecting a change in the 1936 amendment, was advised- by the attorne3' general’s office that the 1938 amendment precluded the granting of exemptions to any industries other than
 
 those engaged in
 
 manufacturing. It immediately adopted a rule or policy in keeping with this advice; and on the following September 22, 1938, at a regular meeting, it rejected a number of applications because of the inability of the applicants to qualify as manufacturers. Included in this group was the Royal Linen Supply Company of New Orleans. This action occurred only a few days prior to the first rejection of relator’s request by the executive director. The advice so given to the board, and accepted and acted upon by it, was, we think, incorrect. At that time, as well as when relator’s application was filed, the 1936 amendment had not been changed. True, the legislature had previously adopted Act No. 37 of 1938, suggesting the change to the electorate, but that proposed constitutional amendment did not become effective until December 9, 1938, or long after the application’s filing.
 

 Where, by reason of a mistaken view of the law, there has been in fact no actual and bona fide exercise of discretion by a board, mandamus will lie. This principle was followed in State ex rel. Bank of Franklinton v. Louisiana State Board of Agriculture & Immigration, 122 La. 677, 48 So. 148, and State ex rel. Day v. Rapides Parish School Board, 158 La. 251, 103 So. 757, to which our attention has been directed by relator’s counsel. It might have been pertinent to this case, when the application was rejected because of the board’s erroneous appreciation of
 
 *635
 
 the law, to compel a proper exercise of that agency’s discretionary power; but, as hereinafter shown, it is not now applicable.
 

 By the opinion of the Attorney General’s office of August 15, 1940, the previous legal rulings, which formed the basis for the first two rejections of the application, were rescinded and corrected; and the board was thereby advised that relator’s application was timely filed, the 1936 amendment being then in full force and effect.
 

 With this correct interpretation of the law before it, the board registered a refusal of the application on- September 19, 1940, no reason therefor being assigned. Later, further consideration was given; and it was followed by a rejection on April 15, 1941, on the ground that relator’s business is locally competitive, and that “to grant tax exemption in this case would have enabled the applicant to operate with an unfair preferential over other local industries engaged in the same type business, who do not enjoy the privilege of tax exemption.”
 

 This decision, as well as the similar rejection on September 18, 1941, was made while the members of the board correctly understood the law that governed relator’s application. And there is nothing in the evidence, as we appreciate it, tending to show that such action of the board did not represent an actual and bona fide exercise of its discretion. On the contrary, our study of the record leaves us with the conviction that it did. As above shown, the board was charged with the duty of promoting the general welfare of the state. Its decisions were to be only those that would redound to the state’s best interests. While in the performance of its duties, according to the board’s chairman, Mr. Patterson, considerable trouble was experienced “about passing exemptions to competitive businesses” ; many complaints were urged by competing industries already established.
 

 These complaints prompted the board to adopt the policy that no industry, whether manufacturing or otherwise, would be recommended for the exemption if it engaged in a business of a locally competitive nature. Obviously this was in the interest of the state’s general good and welfare. It was so stated to be by Mr. Patterson, who originally favored the granting of relator’s application, in the following testimony given by him:
 

 "Q. Wellj is it your recollection of the polling of the Board and is it your opinion as a member of the Board that even if a business be a manufacturing business under the definition as contained in the Amendment of 1938, that nevertheless it should not be entitled to the exemption if it was locally competitive?
 

 “A. Yes, that is my own opinion now for the good of the State. I didn’t think that to start with but’ I have found it out.”
 

 It was after the adoption of, and pursuant to, that policy that the board finally rejected the- demands of relator as well as those of numerous other applicants.
 

 In their brief, counsel for relator argue:
 

 “The denial of relator’s application was all the more discriminatory because, as shown by the testimony, exemption had
 
 *637
 
 been granted to other concerns engaged in the same business as relator, one of these exemptions to a laundry being granted on December 1, 1937, and another on September 2, 1938, after the passage of Act 37 of 1938, which had been offered as the reason for denying the exemption to relator.”
 

 The laundry recommended for exemption by the board on December 1, 1937, was Blackman’s Laundry of Alexandria, Louisiana. The other laundry referred to was also located in Alexandria. It was known as Alexandria Steam Laundry. The recommendation of the board respecting the latter did not occur on September 2, 1938, as the quoted extract from counsel’s brief indicates, hut on June 22, 1938. The date of September 2, 1938, according to the evidence, was that on which the Governor approved the grant. The board acted in each of those cases, it appears, before receiving any advice from the attorney general respecting the law’s change. That those beneficiaries are engaged in the same business as is relator does not indicate discrimination on the board’s part. They are located in Alexandria and in no manner compete with relator’s business which is in New Orleans. Quite significant, in this connection, is the fact that no tax exemption has ever been granted to any New Orleans laundry.
 

 Counsel next offer a discussion in their brief about the locally competitive rule, above referred to as having been adopted and followed by the board. First they comment:
 

 “ * * * That this rule, if adopted at all by the Board, was adopted solely to fit certain particular cases, becomes obvious when an examination is made of the list of tax exemptions thereafter granted by the respondent Board.
 

 “Included in the concerns granted exemptions were those engaged in such highly competitive businesses as soft drink bottlers, bakeries, pants manufacturers, stationery manufacturers, cotton gins, meat packers, and saw mills. Exemptions were also granted, as late as December, 1941, to concerns which clearly did not come within the definition of manufacturing establishments, as contained in the constitutional amendment which became law in December, 1938, such as power plants, utility companies, dairy companies, canning and mining companies.”
 

 Further they say:
 

 “The testimony of Mr. Patterson (Rec. pp. 162-190) as well as that of Mr. Stanford, the employee of the respondent Board, (Rec. pp. 130-158) shows clearly that this Board really had no fixed standards on which to go; that exemptions were granted, or refused, solely within the unbridled discretion and at the whim and caprice of the Board. * *
 

 Then they name and direct attention to individual enterprises receiving tax exemptions which they assert were either engaged in locally competitive businesses or were not manufacturing industries.
 

 Among those named were two bakeries in Alexandria, admittedly engaged in a
 
 *639
 
 locally competitive business. These, as the record shows, desired to and did expand their plants so that they could supply the several large army encampments located near that city; and practically all of the increased production was sent there. It was because of these extenuating circumstances that recommendation for the exemption was made by the board.
 

 As to whether or not the other referred to individual enterprises were worthy of the exemptions, we have no right to substitute our judgment for that of the board. It may be that the board’s discretion was exercised unwisely, and not to the best interests of the state, in some instances; but whether it was is not for us to decide. In this connection, it is observed that the board granted approximately 365 applications and rejected about 261. We are to determine in this case whether there has been an arbitrary, discriminatory and capricious abuse of the board’s discretion as against relator. State ex rel. Thoman v. State Board of Certified Public Accountants, 172 La. 261, 134 So. 85. The record, as before stated, does not support the affirmative of that question.
 

 The “equities in favor of the granting of the application”, said to exist by the executive assistant attorney general in his letter of August 15, 1940, was a matter that addressed itself to the merits of relator’s demand and to the sound discretion of the board; it is of no importance in determining whether the extraordinary remedy of mandamus lies in this cause.
 

 For the reasons above given, the judgment of the district court is reversed and set aside, and the suit of relator is dismissed at its costs.
 

 O’NIELL, C. J., and ROGERS, J., dissent, being of the opinion that the judgment appealed from should be affirmed.