| LOUISE KALTENBAUGH, PH.D. AND KATHERNIE ROBINSON, PH.D. | * | NO. 2018-CA-1085 |
| | | |
| | * | COURT OF APPEAL |
| VERSUS | * | FOURTH CIRCUIT |
| | * | STATE OF LOUISIANA |
| BOARD OF SUPERVISORS, SOUTHERN UNIVERSITY AND AGRICULTURAL AND MECHANICAL COLLEGE AT BATON ROUGE (SOUTHERN UNIVERSITY AT NEW ORLEANS CAMPUS) | * * * * * * * | |

| CONSOLIDATED WITH: | CONSOLIDATED WITH: |
| --- | --- |
| DAYANAND THANGADA, AUDREY S. MCGEE AND SHIRLEY A. WILLIAMS-SCOTT, PH.D. | NO. 2018-CA-1086 |

VERSUS

BOARD OF SUPERVISORS,
SOUTHERN UNIVERSITY AND
AGRICULTURAL AND
MECHANICAL COLLEGE AT
BATON ROUGE (SOUTHERN
UNIVERSITY AT NEW ORLEANS
CAMPUS)

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2006-04126, DIVISION "D"
Honorable Nakisha Ervin-Knott, JUDGE

* * * * * *

**JUDGE SANDRA CABRINA JENKINS**

* * * * * *

(Court composed of Judge Terri F. Love,
Judge Roland L. Belsome, Judge Sandra Cabrina Jenkins)

*BELSOME, J., CONCURS IN THE RESULT.*

Willie M. Zanders, Sr.
ATTORNEY AT LAW
25912 Stonehenge Drive
Denham Springs, LA 70726

    COUNSEL FOR PLAINTIFFS/APPELLEES

Winston G. DeCuir, Sr.
DECUIR CLARK & ADAMS, L.L.P.
732 North Boulevard
Baton Rouge, LA 70802

COUNSEL FOR DEFENDANT/APPELLANT

**AFFIRMED**

**OCTOBER 23, 2019**

These consolidated appeals arise out of the decision by appellant, the Board of Supervisors, Southern University and Agricultural and Mechanical College at Baton Rouge (the "Board"), to furlough its tenured professors at Southern University at New Orleans ("SUNO") following Hurricane Katrina. After a three day bench trial -- spanning a three-year period and presided over by two different judges -- the trial court rendered a judgment awarding damages to three plaintiffs who were wrongly furloughed and not re-called. For the reasons that follow, we affirm the trial court's August 14, 2018 judgment in favor of plaintiffs. We deny plaintiffs' Answer to Notice of Appeal.

## FACTUAL AND PROCEDURAL BACKGROUND

In August 2005, SUNO sustained massive damage from Hurricane Katrina. Thereafter, the Board adopted a Force Majeure Exigency Plan ("Force Majeure Plan"), which applied exclusively to the SUNO campus. The Board adopted these policies in response to what it saw as the emergency and unforeseeable circumstances which made continuation of employment of faculty and staff,

1

tenured and untenured, classified and unclassified, impossible. Thus, the Board adopted a "new streamlined program for SUNO which allowed them to make only limited [job] offerings." The program resulted in the elimination of 19 degree programs at SUNO. Chief among those was SUNO's programs in Secondary Education and Biology.

Under the "streamlined" program, the SUNO faculty was reduced from a July 1, 2005 total of 163 employees to a May 2006 count of 92 active employees. The remainder either voluntarily left or were placed on furlough. As of May 2006, 31 tenured teachers were placed on furlough and 10 voluntarily departed through resignation or retirement.[1] The enrollment at SUNO dropped from a pre-Katrina level of about 3,642 students to a January 2006 level of approximately 2,080 students, 230 of which were part-time.

On May 12, 2006, two furloughed SUNO professors, Louise Kaltenbaugh, Ph.D., a tenured associate professor in the College of Education; and Katherine Robinson, Ph.D, a tenured assistant professor in the College of Education; sued the Board, alleging violations of due process, and seeking a writ of mandamus ordering that they be reinstated to their positions at SUNO. The trial court denied the writ of mandamus on May 31, 2006, and this Court denied supervisory writs on August 2, 2006.

On July 5, 2006, Dayanand Thangada, Audrey McGee, and Shirley Scott-Williams, Ph.D., filed a separate suit in Orleans Parish Civil District Court alleging

---

[1] Ten of the 36 probationary teachers were placed on furlough and 20 of the 27 temporary employees were placed on furlough.

2

that SUNO had furloughed them or not re-called them to work without due process, and seeking damages and attorney's fees.

On September 29, 2006, Dr. Robert Perry, a tenured faculty member at SUNO who taught mathematics, biology, physics and other science courses, joined the lawsuit with three co-plaintiffs, Mr. Thangada, a tenured assistant professor in the College of Business; Dr. Williams-Scott, a tenured full professor in the Science Department; and Ms. McGee, a tenured assistant professor in the Junior Division (collectively, "Plaintiffs"). On April 8, 2013, the two suits were consolidated by order of the court. On July 6, 2015, Dr. Kaltenbaugh, Dr. Robinson, and Mr. Thangada filed a joint motion to dismiss, advising the court that they had settled or resolved their claims against the Board.

In their Petitions, Plaintiffs contend that they were denied their property rights of tenure by being "furloughed" without pay or benefits, which was a removal from their tenured positions.[2] They allege that SUNO's removal of Plaintiffs was an unconstitutional denial of due process in violation of the Louisiana and United States Constitutions. According to the Plaintiffs, "procedurally there was not a proper and reasonable hearing and the substantive directives for removal were arbitrary and capricious, and not reasonably related to the academic, financial, and professional protections afforded tenured professors." Plaintiffs sought to be reinstated to their positions as tenured professors, together

---

[2] Under the Board's Force Majeure Plan, "Furlough" means the employee is placed on temporary leave without pay status before the end of the employee's contract term; "lay-off" means the employee is temporarily dismissed before the end of the employee's contract term; and "terminate" means the employee is permanently separated from the institution. Both furloughs and lay-offs may lead to eventual termination.

with all pay, benefits, and emoluments of their positions, as well as damages for violation of their property rights and infliction of emotional distress.

On December 9 and 10, 2015, a bench trial was held before Judge Lynn Luker, Judge *Pro Tempore*. Judge Luker's appointment ended before a decision was rendered. On August 1, 2018, the trial was concluded before Judge Nakisha Ervin-Knott after an additional day of testimony. On August 14, 2018, the trial court signed a judgment against the Board and in favor of Dr. Perry, Dr. Williams-Scott, and Ms. McGee. The trial court awarded loss of income damages measured at each Plaintiff's salary for three years. Dr. Williams-Scott was awarded $162,618.00, Ms. McGee was awarded $135,666.00, and Dr. Perry was awarded $125,277.00, plus judicial interest and costs.

The Board's motion for new trial was denied on September 24, 2018, and on October 22, 2018, the trial court signed an order granting the Board a devolutive appeal. On January 3, 2019, pro se plaintiffs Ms. McGee and Dr. Williams-Scott filed an Answer to Notice of Appeal, and the Board filed a Reply and Opposition on March 27, 2019.

## DISCUSSION

**Assignments of Error**

The Board lists three assignments of error:

- The trial court erred in applying the law with regard to due process and employment in an extreme disaster situation.

- The trial court erred in setting aside the findings of the University Hearing Officer and Chancellor that Plaintiffs were to be furloughed and not recalled to work.

- The trial court erred in setting the quantum of damages for the Plaintiffs at a loss of wages for three years.

4

- The trial court erred in not requiring Plaintiffs to mitigate their damages.

**The Plaintiffs**

*Dr. Robert Perry*

Dr. Perry was employed at SUNO as an associate professor of physics and mathematics, a tenured position. He was chairman of the department of mathematics and physics for seven years. Dr. Perry taught mathematics, physics, calculus, algebra, number theory, physics of waves, acoustics, and electromagnetic theory. Dr. Perry has a Ph.D. in physics from Howard University, a BA degree in math physics from Talladega College, with additional study at Berkeley and Columbia University. Dr. Perry testified that he never received anything in writing explaining why he was furloughed or any notice of a furlough appeal. Dr. Perry testified that he attempted to meet with the department chair in Baton Rouge after he evacuated to Houston but the chairperson did not show up and "avoided" him. He also testified that he did not attend a furlough hearing scheduled for him at SUNO.

*Dr. Shirley Williams-Scott*

Dr. Williams-Scott was a full-time professor at SUNO teaching biology in the College of Science, which included mathematics, physics, chemistry, and computer science. She was the department chair from 1993-1998 and was also a full professor with tenure. She has a Ph.D. in Physiology and Biophysics from the University of Alabama, a master's degree in Biology and Experimental Dermatology from Brown University, and a BA degree from Miles College. Dr. Williams-Scott described a belligerent environment at SUNO. She testified that she was removed as the chairperson of the biology department in 1998 because she refused to endorse Dr. David Adegboye's application for promotion and

5

tenure. In November 2005, she received a letter that she was being furloughed without pay, and appealed it. Although she attended the furlough appeal hearing, she stated that she did not receive documentation from the hearing, and the hearing was not recorded. According to Dr. Williams-Scott, she was furloughed even though the only biology program that was eliminated was the biology program for teachers, and not the general biology program that she taught.

*Ms. Audrey McGee*

Ms. McGee has a BS in secondary education, a master's of science in reading, and 36 hours in Assertive Teaching. Ms. McGee was the tenured reading/study skills teacher's assistant professor in the Student Support Services Program of the Junior Division at SUNO, which included developmental reading, math, English, tutorial, and counseling. The program is federally funded and the government allocates nearly half a million dollars per year (between $470,000 and $500,000). To her knowledge, their student support funding was not terminated after Katrina, and SUNO still had a Junior Division after the storm. She never received notice that her furlough had ended or that she had been fired. She recalls attending a campus hearing for three hours that was conducted by Dr. Rose Duhon-Sells, Vice Chancellor of Academic Affairs. She testified that there was no recording of the hearing or written reports made.

**Standard of Review**

A court of appeal may not set aside a trial court's finding of fact in absence of "manifest error" or unless it is "clearly wrong." *Carter v. Cox Cable, New Orleans*, 00-1934, 00-1935, 00-1936, 00-1937, p. 2 (La. App. 4 Cir. 12/12/01), 806 So.2d 24, 27. The Supreme Court has a two-part test for reversal of a factfinder's determinations: (1) the appellate court must find from the record that a reasonable

6

factual basis does not exist for the finding of the trial court; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifest error). *Id*. (citing *Mart v. Hill*, 505 So.2d 1120, 1127 (La. 1987)).

## DUE PROCESS

### *Due Process in Extreme Disaster Situations*

With respect to Plaintiffs' due process claims, SUNO argues that the Louisiana Supreme Court's decision in *Oliver v. Orleans Parish School Board*, 14-0329, 15-0330 (La. 10/31/14), 156 So.3d 596, which addressed due process in an extreme disaster situation caused by Katrina, applies to this case.[3]

In *Oliver*, approximately 7,600 former teachers and other permanent employees of the Orleans Parish School Board ("OPSB") who were laid off or terminated claimed a "due process" violation by the OPSB. During its first post-Katrina board meeting, the OPSB had approved a resolution to place employees on disaster leave, "given the emergency closure of all schools and the subsequent lack of revenues." The "disaster leave" was without pay, retroactive to August 29, 2005, and allowed the employees to collect unemployment benefits while New Orleans and the OPSB tried to recover from the hurricane. OPSB set up a 24-hour employee hotline to communicate with displaced employees and to begin to determine which employees could return to work when the schools re-opened.

In *Oliver*, effective November 30, 2005, the legislature passed an act that resulted in the transfer of the vast majority of Orleans Parish public schools to the State's Recovery School District ("RSD"). The new provision resulted in 102 of

---

[3] In *Oliver*, the Supreme Court declared the parameters of the state and federal due process clauses. "In order to prove a violation of substantive due process, a defendant 'must first establish the existence of a constitutionally-protected property or liberty interest.'" *Id*., 14-0329, p. 35, 156 So.3d at 619-20. "Procedural due process requires that before an individual is deprived of a property or liberty right, the individual must be provided with notice and an opportunity to be heard." *Id*., 14-0329, p. 35, 156 So.3d at 620.

the 126 public schools in Orleans Parish being taken over by the State after Hurricane Katrina. Of the 24 schools remaining, seven were closed as uninhabitable, 12 became charter schools, and five remained under the jurisdiction of the OPSB. The legislature's act resulted in a severe loss of funding to the OPSB, including $17 million per month in funds from the State. In addition, because the OPSB only retained five schools, it had a dramatically reduced need for employees. On February 26, 2006, the OPSB notified all OPSB employees in a letter that a reduction in force was being instituted, and that they would be terminated effective 30 days from the issuance of written notice. The OPSB advised the employees that it did not anticipate calling employees back to work and would not prepare a recall list.

The *Oliver* plaintiffs then filed a class action suit alleging that the unpaid disaster leave violated their statutory and procedural and substantive due process rights as guaranteed by the U.S. and Louisiana Constitutions. The trial court found that OPSB violated the plaintiffs' due process rights because the OPSB failed to create a recall list, so that the class members lost the opportunity for employment for two years.

On appeal, the Supreme Court reversed the trial court's finding that OPSB violated the plaintiffs' due process rights. The Supreme Court found that the 24-hour call center, which created a list of employees who intended to return to work "was not perfect and did not technically amount to a recall list." The Court concluded however, that "the 'process' afforded by the City to civil servants in the wake of Hurricane Katrina, while imperfect, was not constitutionally deficient in light of the extraordinary challenges the City of New Orleans faced." *Oliver*, 14-0329, p. 37, 156 So.3d at 621.

8

The *Oliver* Court held:

> [W]e find that neither the OPSB nor the State defendant's [sic] violated the class members' due process rights. Lack of a recall list does not constitute a due process violation, the procedures used by the OPSB to locate their employees after Katrina was [sic] sufficient to meet due process standards, and the vast majority of those rehired by the OPSB were former OPSB employees. Finally, there is no constitutionally protected interest in the right to "priority consideration' for employment with a third party, and the plaintiffs offered no proof they were not given priority consideration.

*Id.*, 14-0329, p. 40, 156 So.3d at 623.

We now examine the Board's due process protections for SUNO employees adopted after Hurricane Katrina.

### *Due Process and the Board's Force Majeure Plan*

After Katrina, Southern University recognized that "[e]mergency measures [were] necessary to enable SUNO to continue its fundamental mission." The responsibility and authority to address such issues was placed upon the Board, which adopted a Force Majeure Plan for Hurricane Katrina. The Force Majeure Plan announced that "[a]s a consequence of the destruction caused by the hurricane, SUNO expects soon to lay off employees."

The Force Majeure Plan had three parts: (1) the procedures for program discontinuance; (2) the procedures for program modification; and (3) the procedures for notification and review. The Force Majeure Plan stated that these "procedures to modify or discontinue programs and take Disaster-caused Employment Actions at SUNO are appropriate for the Board to respond to this crisis in an orderly and reasonable manner while respecting the needs and rights of the affected employees to the fullest extent possible under these extraordinary conditions."

In the Force Majeure Plan, the Board reemphasized that, under its

regulations, the fundamental principle that even with respect to the traditionally most protected academic employees of a higher education institution, "[t]enure is not a guarantee of lifetime employment. **It does assure that the employee will not be dismissed without adequate justification and due process**." (Emphasis added)

Under the Force Majeure Plan, the "Procedures for Program Discontinuance" applied to furloughs, lay-offs, and termination of tenured employees as a result of Katrina:

- The procedures shall be followed by the President of the Southern University System and the Chancellor of SUNO to modify or discontinue programs and activities, including furlough, lay-off, or termination of tenured and non-tenured faculty members, unclassified staff, and other contract employees . . . ("Disaster-caused Employment Actions") when such modification or discontinuance is implemented as a result of Hurricane Katrina.

- In implementing these procedures, the President and the Chancellor shall give primary consideration to the maintenance of sound and balanced educational and other programs that are consistent with the functions and responsibilities of the institution.

- Prior to making a recommendation to discontinue a program, the Chancellor shall take reasonable steps under the circumstances to consult with deans, department heads, and faculty representatives.

- Upon a determination by the Chancellor that it is in the best interests of the institution to discontinue a program, the Chancellor shall make such a recommendation to the President. The President shall make a recommendation to the Board, which shall make the final decision.

- Upon a determination by the Board that a program should be discontinued, the President of the Southern University System shall have final authority to implement the plan, including Disaster-caused Employment Actions.

The Force Majeure Plan also had "Procedures for Notice and Review" of Disaster-caused Employment Actions:

- Once a program has been discontinued or the Dean (or equivalent) has made a recommendation, SUNO shall notify each affected employee of the proposed disaster-caused employment action in writing (including e-mail). The notice shall include a summary of the proposed action, the reasons therefor, and the available review process.

- An employee notified of a proposed disaster-related employment action may respond in writing to the proposed action within five days from their receipt of the notice and opportunity to be heard. The request shall be sent to the Vice Chancellor who, with the Dean, shall meet within five days of the request.

- The Vice Chancellor and the Dean shall listen to and consider any facts and contentions presented by the employee and review the initial recommendation as to that employee. Unless the recommendation is modified, the Vice-Chancellor shall submit the recommendation, along with any written materials submitted by the employee, for the Chancellor's review and decision.

- After reviewing the Dean's recommendation, any submittal by the Vice-Chancellor, and any written materials submitted by the employee, the Chancellor shall notify the employee in writing of the final decision.

- The employee may apply to the office of the Southern University President for review of the decision by submitting a written request to the office within three days from the receipt of the notice of the final action by the Chancellor. Such review shall be at the President's sole discretion and in his sole discretion may be on the record only.

In light of the Supreme Court's minimal due process standard for emergency situations set forth in *Oliver*, we find that the Board's binding procedures adopted in the wake of Katrina, which provide for notice and an opportunity to be heard, on their face, satisfy procedural due process.

As discussed below, however, we further find that SUNO did not follow the Board's due process standards.

## ARBITRARY AND CAPRICIOUS ACTION

With respect to the second assignment of error, we will address SUNO's contention that the trial court wrongly set aside the Chancellor's decision to

11

furlough the Plaintiffs, and that it substituted its judgment for that of the SUNO officials who placed the Plaintiffs on furlough. Dr. Perry argues that SUNO's furlough and recall process, as implemented, was arbitrary and capricious. The word "capricious" is defined as a "conclusion made without substantial evidence or a conclusion contrary to substantial evidence." *I.F. v. Admin'rs of Tulane Educ. Fund,* 13-0696, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 491, 499. The word "arbitrary" "implies a disregard of evidence or the proper weight thereof." *Id.* Dr. Perry also contends that SUNO's Chancellor and administrators' actions were contrary to specific furlough/recall/termination criteria mandated by the Board.

The Force Majeure Plan sets forth the following "Procedures for Program Modification," which list specific criteria governing disaster-caused employment actions:

- The Chancellor shall determine how many and what type of positions are currently needed, can be funded, and have work to be done in programs: (i) not recommended for discontinuance and (ii) for which modification is feasible and appropriate. The Chancellor shall consult with the deans, department heads and, as reasonable under the circumstances in his determination, faculty members.…

- The initial decision to take Disaster-caused Employment Action as to a particular employee was to be made by the Dean (or equivalent) after consultation with the department head (or equivalent). The Dean shall recommend any such action to the Chancellor based on the following criteria:

- The needs and requirements of the institution and the program, with the primary focus on the maintenance of sound and balanced programs that are consistent with the functions and responsibilities of the institution; and

- The value an individual employee provides toward meeting the needs and requirements of the institution, which may be based upon:
    1. The existence of a revenue stream dedicated to or based on the work of the employee (e.g., grants, contracts, etc.);

12

2. The employee's research or teaching skill set, particularly when that skill set would be difficult to replace;
3. The employee's recent performance and productivity, including academic (teaching and other scholarship), research, and administrative accomplishments;
4. The employee's history of productivity, including academic (teaching and other scholarship), research, and administrative accomplishments;
5. Evidence of the employee's long-standing commitment and contributions to the institution;
6. Evidence of the employee's outstanding service to the institution in the immediate aftermath of Hurricane Katrina; and
7. Other relevant and compelling institutional considerations.

The Board contends that the trial court ignored that the "first and primary consideration [in employment decisions] was the needs and requirements of the reconstituted SUNO, which no longer maintained the pre-hurricane degree offerings, or enrollment." According to the Board, the trial court after examining the testimony of university officials, the Chancellor and the Vice Chancellor decided to substitute its judgment (with regard to the Plaintiffs) for that of the university officials. The Board cites the following language from *State ex rel. Bourgeois v. Bd. of Supervisors Louisiana State Univ.*, 17 So.2d 25 (La. 1944):

> We have no right to substitute our judgment for that of the authorities of the University, especially since there is no contention that the authorities of the University discriminated arbitrarily against the relator or acted in a capricious manner. Whether the University's judgment was exercised wisely or unwisely is not for us to decide.

*Bourgeois*, 17 So.2d at 189.

According to the Supreme Court, although a public board has duties which lie solely within its discretionary powers, this rule is "subject to the very definite qualification that there must not be an arbitrary, unjust or capricious exercise of that discretion." *State ex rel. Kohler's Snowite Laundry & Cleaners, Inc. v. State Bd. of Commerce & Indus.*, 205 La. 622, 632, 17 So.2d 899 (1944); *Bourgeois*, 17

So. 2d at 29 (a court has no right to substitute its judgment for that of University authorities in the absence of arbitrary or capricious actions); *Olivier v. Xavier Univ.*, 553 So.2d 1004, 1009 (La. App. 4th Cir. 1989) (Plotkin, J., concurring) (because the University's dismissal of plaintiff was in compliance with all procedure, and defendant's conduct was neither arbitrary nor capricious and fully complied with due process of law, this court should not substitute its judgment for that of University authorities (citing *Bourgeois*, *supra*)).

A review of the trial court's reasons for judgment shows that, based on the testimony of Chancellor Ukpolo, Vice Chancellor Adegboye,[4] and Dr. Edward Jackson, president of the Southern University System, SUNO "did not adequately adhere to its own policy of recalling and/or the policies of the appeal hearings." As pointed out by the trial court, "processes are put in place and they should be followed, and I do not believe that SUNO, in this instance, followed their own policies."

The trial court explained its rationale in its Reasons for Judgment:[5]

> The question for me becomes whether the plaintiffs, the three who testified today, under the policies and procedures established by the Board of Regions [sic] and the Board of Supervisors under the Southern University system were provided with due process as it relates to both the furlough and the recall procedures put into place post Katrina.
>
> \* \* \* \* \* \*
>
> The processes that was [sic] in place by the Force Majeure Policy was [sic] in place for a reason. Unfortunately, this Court does not find that the policy was carried out, as Dr. Jackson testified, that it should have been, and to some extent that Dr. Ukpolo testified it should have been. . . . But there was a decision made at some point to

---

[4] At the time of Hurricane Katrina, Dr. Adegboye was the chairman of the department of biology.

[5] We may examine the trial court's reasons for judgment set forth in the trial transcript. "[T]he entire reason for having the trial court provide written reasons for judgment is to furnish the appellate court with guidance in understanding how the lower court reached its decision." *Morton M. Goldberg Auction Galleries, Inc. v. Canco, Inc.*, 94-0734, p. 3 (La. App. 4 Cir. 1/31/95), 650 So.2d 801, 803.

recall some individuals, and I do believe these employees, the plaintiffs here, in their skill set, in their background, that a decision could have been made that they were one of the people that could have and should have been recalled.

The Court finds that the SUNO system did not adequately adhere to its own policy of recalling and/or the policies of the appeal hearings. Processes are put in place and they should be followed, and I do not believe that SUNO, in this instance, followed their own policies. I believe the contracts were violated as to due process.

There was no record of the appeal hearing. So when Dr. Ukpolo received the file to make a determination whether or not to comply with the recommendation that was made through the ranks, there was no proof that he had information from the plaintiffs' [sic] who had appealed, or at least two of them who had gone through the process. I thinks that's a problem when you're testifying and you are providing the Court that "I went through a procedure," but you can't provide me with what evidence or what materials you outlined for the procedure. As it relates to Dr. Shirley Scott, I don't believe that there was a valid reason given by any of the defendants who had testified . . . why she should not have been recalled. . . . I don't believe that through all of the steps that a clear explanation was given as to whether or not – as to why she was not one of the employees who was recalled.

Lastly, as to Ms. Audrey McGee, Student Support Services, I don't find a valid reason why she should not have been recalled, especially given that the funding, the federal funding was in place. There was funding in place pre Katrina and post Katrina, and there is no reason why Ms. Audrey McGee should have not been put back or recalled back to the university system.

The Board argues that the trial court overlooked the "standard" by which the individuals chosen for recall were being selected. The Board conceded that each of the Plaintiffs were qualified faculty members in the areas for which they were employed prior to Hurricane Katrina. The Board maintained, however, that "the first and primary consideration was the needs and requirements of the reconstituted SUNO. According to SUNO officials, the "critical" criterion was to keep professors who could teach the courses required for its students to graduate with 121 credit hours.

Dr. Edward Jackson, interim President of Southern University during Katrina, testified that the seven criteria listed in the Force Majeure Plan were

15

binding on the department chair, the dean of the college and the Vice Chancellor. According to Dr. Jackson, if these officials did not follow the criteria, the recommendation to furlough Plaintiffs should not have been made, and should not have been affirmed later on. He also testified that a report of the hearing on the furlough decision should have been sent to the employee.

Dr. David Adegboye, the department chair of biology who later became Vice Chancellor for Academic Affairs, was asked what factors he considered in deciding whether to recommend furlough, and he responded, "whoever [he] needed to teach biology." According to Dr. Adegboye, the needs of the university were the critical criterion, and "tenure did not matter"; years of service did not matter; productivity mattered only "relatively"; research did not "matter much"; and an employee's outstanding service to SUNO did not matter "above specialty. At trial, Dr. Adegboye was told by Plaintiffs' counsel that he had answered "no" to seven of the Force Majeure Plan's criteria. He responded, "I don't agree." Where two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. *Carter v. Cox Cable*, 00-1934, p. 4 (La. App. 4 Cir. 12/12/01), 806 So.2d 24, 28.

Likewise, Dr. Victor Ukpolo, a professor of economics who became the Chancellor of SUNO in January 2006,[6] stated that the seven factors in the Force Majeure Plan were "five percent" of the decision-making process and were "miniscule," with the major factor again being the needs of the university.

Notwithstanding the procedure set forth in the Force Majeure Plan's program for Notification and Review, which requires SUNO to notify in writing any affected employee of the furlough, lay-off, or termination in writing, Dr. Perry

---

[6] After Katrina, Dr. Ukpolo replaced Dr. Robert Gex as Chancellor of SUNO.

testified that he did not receive written notice of the furlough appeal hearing presided over by Dr. Rose Duhon-Sells, the Vice Chancellor for Academic Affairs.[7] Even though Dr. Jackson testified that reports of the furlough hearing should have been sent to the employees, Dr. Williams-Scott said that she did not receive a post-hearing report from Dr. Duhon-Sells. Audrey McGee also testified that she did not receive a post-hearing written report from Dr. Duhon-Sells. Dr. Williams-Scott stated that even though SUNO went through the procedure of a hearing, "it was basically a non-hearing."

And although one of the criteria was the "existence of a revenue stream dedicated to or based on the work of the employee," Ms. McGee stated that she was furloughed even though the Junior Division was not eliminated after Katrina, and it continued to receive at least $500,000 annually from the federal government to operate. She also testified that her Student Support Services program continued to operate with federal funds, even though student enrollment was down.

Our review of the record, in light of the trial court's factual findings, establishes that SUNO disregarded or minimized the criteria set forth in the Force Majeure Plan, i.e., the existence of a revenue stream based on the work of the employee; the employee's research or teaching skill set; the employee's recent performance and productivity; the employee's history of productivity; evidence of the employee's outstanding commitment and contributions to the institution; and evidence of the employee's outstanding service to SUNO after Katrina. SUNO also disregarded its obligation to provide Plaintiffs with written reports of their furlough hearings.

---

[7] Dr. Duhon-Sells did not testify at trial.

We find that SUNO's decision to furlough Plaintiffs was without due regard for the specific furlough/recall/termination criteria mandated by the Board. Because SUNO did not follow its own binding procedures, its decision was arbitrary and capricious, and not entitled to deference. *See I.F.,* 13-0696, p. 12, 131 So.3d at 500. In *I.F.*, this Court declared:

> We acknowledge that Tulane's due process procedure may afford protections beyond that required by state law. However, Tulane must adhere to the standards it provides. It imposed upon itself the duty by its own policies and procedures and it is obligated contractually to follow through completely, meaningfully, and in good faith.

*I.F.*, 13-0696, p. 8, 131 So.3d at 497.[8] *See also Babcock v. New Orleans Baptist Theological Seminary*, 554 So.2d 90, 95 ("The question raised by Babcock's petition is whether the Seminary followed its own due process guidelines in seeking to dismiss Babcock.").

For these reasons, we affirm the trial court's judgment finding that the Board's due process procedures, as implemented, were deficient. We also affirm the trial court's finding that the Board's decision to furlough Plaintiffs was arbitrary and capricious.

## DAMAGES

In its third assignment of error, the Board argues that the trial court erred in awarding Plaintiffs their lost salary for three years.

Lost wages are a form of special damages. *Kaiser v. Hardin*, 06-2092, p. 11 (La. 4/11/07), 953 So.2d 802, 810. "Unlike general damages, which are not susceptible to exact pecuniary determination, special damages are those that have a ready market value, so that the amount of damages theoretically may be

---

[8] In *I.F.*, this Court found a "fundamental error" in the trial court's limiting admissible evidence to the issue of due process, without considering any evidence of whether Tulane's decision was arbitrary and capricious. *I.F.*, 0696, p. 7, 131 So.3d at 497.

determined with relative certainty." *Lobell v. Rosenberg*, 14-0060, p. 7 (La. App. 4 Cir. 1/27/16), 184 So.3d 850, 855. A plaintiff must prove special damages by a preponderance of the evidence. *Id.* An appellate court reviews an item of special damages pursuant to the manifest error-clearly wrong standard of review. *Id.*, 14,0060, pp. 7-8, 184 So.3d at 855. "An appellate court, in reviewing a trier of fact's conclusions with regards to special damages, must satisfy a two-step process based on the record as a whole: there must be a reasonable factual basis for the trial court's conclusions, and the finding must not be clearly wrong." *Id.*, 14-0060, p. 8, 184 So.3d at 855.

At trial, Plaintiffs testified as to their annual salary at SUNO before they were furloughed. The record also contains a letter from SUNO confirming the Plaintiffs' annual salary, which was stipulated to by the parties. Plaintiffs testified that they were tenured professors at SUNO. [9]

Here, after decades of teaching at SUNO, Plaintiffs were arbitrarily furloughed and never re-called, losing their right to continued employment at SUNO as a tenured professor. The trial court awarded the Plaintiffs three times their annual salary. Based on the record, we cannot say that no reasonable factual basis exists for the trial court's award and secondly, that the award is clearly wrong. *See McCloskey v. Higman Barge Lines, Inc.*, 18-1008, p.5 (La. App. 4 Cir. 4/10/19), 269 So.3d 1173, 1178.

---

[9] The Board suggests tenure was no longer relevant post-Katrina because the Force Majeure Plan "ended all contractual and employment relationships with the University." It is "undisputed" that a tenured professor possesses a property interest in his or her position which requires due process protection under both the state and federal constitutions. *Jones v. Southern Univ. & A&M Coll. Sys. through its Bd. of Supervisors*, 96-1430, p. 7 (La. App. 1 Cir. 5/9/97), 693 So.2d 1265, 1267.

## MITIGATION OF DAMAGES

In its final assignment of error, the Board contends that the Plaintiffs were required to take steps to mitigate their damages. Mitigation of damages is an affirmative defense that must be plead in the answer. *Leaman v. Cont'l Cas. Co.*, 00-0292, p. 11 (La. App. 4 Cir. 9/26/01), 798 So.2d 285, 293; *Earl v. Gusman*, 17-0363, p. 6 (La. App. 4 Cir. 9/27/17), 228 So.3d 268, 272. *See also* La. C.C.P. art. 1003, 1005.[10] In the absence of such a pleading, no proof can be offered in connection therewith. *Pendleton v. Smith*, 95-1805, p. 5 (La. App. 4 Cir. 5/8/96), 674 So.2d 434, 437.

The Board did not plead the affirmative defense of mitigation of damages. Consequently, we cannot consider this argument.

The Board also contends that it is entitled to a credit or set-off for any wages or salaries earned by Plaintiffs during the damage period. Although the record does not reflect that Plaintiffs had fixed term contracts, given the Plaintiffs' tenured status, we find the reasoning in *Andrepont v. Lake Charles Harbor Terminal Dist.*, 602 So.2d 704 (La. 1992) persuasive;

> An employer's breach of a fixed term contract without cause results in the employee's entitlement to compensation for all wages or salary that he would have received. . . . Plaintiff's damages for loss of salary are therefore not reduced by any amounts that he may have earned between termination and expiration of the contract period. Defendant cannot successfully maintain that these damages should be reduced because [plaintiff] could have or should have sought other employment.

*Andrepont*, 602 So.2d at 707.

This assignment of error lacks merit.

---

[10] Under La. C.C.P. art. 1003, "The answer shall . . . state in short and concise terms the material facts upon which the defenses to the action asserted are based, and shall set forth all affirmative defenses as required by Article 1005." La. C.C.P. art. 1005 provides that "[t]he answer shall set forth . . . any . . . matter constituting an affirmative defense."

**ANSWER TO NOTICE OF APPEAL**

In their pro se capacity, Plaintiffs Dr. Williams-Scott and Ms. McGee ("Pro Se Plaintiffs") filed an Answer to the Notice of Appeal. The Pro Se Plaintiffs contend: (1) the Board's motion for devolutive/suspensive appeal was not timely filed; and (2) the Board did not post an appeal bond. The Board argues that its motion for devolutive appeal was filed timely, and that no security is required for a devolutive appeal.

*Timely Appeal*

With respect to the timeliness of the appeal, the judgment from the trial court was signed on August 14, 2018. The Board filed the motion and notice of appeal on October 10, 2019.

La.C.C.P. art. 2087 provides:

A. Except as otherwise provided in this article or by other law, an appeal which does not suspend the effect or the execution of an appealable order or judgment may be taken with sixty days of the following:
   (1) The expiration of the delay for applying for a new trial or judgment notwithstanding the verdict, as provided by Article 1974 and Article 1811, if no application has been filed timely.

Under this article, a devolutive appeal would be timely filed if filed within 60 days after the expiration of the delay for applying for a new trial, or by October 20, 2018. The Board's motion for devolutive appeal was filed on October 10, 2019, and the order of appeal was signed by the trial court on October 22, 2018. No devolutive appeal should be dismissed when the motion for appeal is timely filed but the court order is not signed until after the delay has run. *Traigle v. Gulf Coast Aluminum Corp.*, 399 So.2d 183 (La. 1981). Hence, the appeal was timely. This argument lacks merit.

*Appeal Bond*

Plaintiffs also contend that the Board did not post an appeal bond with their notice of appeal. La. C.C.P. art. 2124 states that "no security is required for a devolutive appeal." The Board has appealed this action devolutively; hence, no appeal bond is required. This argument also is without merit.

## CONCLUSION

For all these reasons, we affirm the trial court's August 14, 2018 judgment.

## AFFIRMED